No. 82,920

STATE OF KANSAS, *Appellee*, v. MALCOLM T. PINK, *Appellant.*
(20 P.3d 31)

Opinion filed March 9, 2001.

*Rick Kittel*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was on the brief with him for appellant.

*Debra S. Peterson*, assistant district attorney, argued the cause, *Nola Foulston*, district attorney, and *Carla J. Stovall*, attorney general, were on the brief for appellee.

The opinion of the court was delivered by

LARSON, J.: This is Malcolm T. Pink's direct appeal from three convictions of felony murder. Issues raised involve a *Batson* challenge, the denial of a motion to suppress, the giving of an aiding and abetting instruction, the refusal to give a "mere association" instruction, and a response to jury questions.

*Facts and court proceedings*

On January 11, 1994, law enforcement officers responded to a shooting call at a residence in Wichita and found three males dead from gunshot wounds.

Erik Carter was seated on a sofa with three gunshot wounds to his head; the two on the right side were fired from an intermediate

range and the one on the left was a contact wound, meaning "at least a portion of the muzzle or the end of the barrel was in contact with the skin." Jimmy Fox was lying face down on the floor and died 2 days later from three gunshot wounds to the head; the wounds to the back of the head and jaw line were from a distant range but the one to the right temple was a contact wound. Travis Wooten was lying on the floor on his side with six gunshot wounds to the head. Due to the absence of powder burns, it was ascertained that the wounds to his right eyebrow, right cheek, and right ear resulted from a weapon discharged from a distant range, but the wounds to his left eyebrow, left ear, and in between were contact wounds.

Shell casings found on the floor were, upon examination with the bullets recovered from Carter, Fox, and Wooten, found to have been fired from the same .25 caliber gun. The killings were unsolved for over 4 years.

In the spring of 1998, additional leads were developed and officers interviewed Pink at the El Dorado Correctional Facility. After being informed of and waiving his *Miranda* rights, Pink told Wichita Police Detective Paul O'Mara and FBI Special Agent Charles Pritchett the following story. On January 11, 1994, Craig Bryant, his stepbrother, came to his house in Arkansas City and talked to him about going to Wichita to do a "lick" (which means a robbery).

Upon arriving in Wichita, they stopped at a liquor store and Bryant commented that he needed to get a different gun because he did not trust his gun. They planned to go to a drug house on North Chautauqua owned by a person named Sambo, who owed Bryant money. Pink was to act as the lookout, act normal, and give the appearance that everything was okay.

Both Bryant and Pink entered the house and after some conversation and listening to music, Bryant jumped from the sofa, displayed a gun, and said, "This is a . . . holdup. Don't do anything funny. Drop out." Pink explained that "drop out" meant that the people were being robbed and needed to give up their property. Pink stated that the person on the sofa by Bryant jumped up and struggled with him and shots were fired from Bryant's gun.

Pink ran for the door to get a board. He told the officers that, "there were no plans for anybody to get hurt or shot or anything like that."

According to Pink, he reentered the residence to stop Bryant and to try to get him to leave, but upon reentering, he saw Fox on the floor and Bryant going through his pockets. Bryant told Pink to get out and he did so. Bryant later told Pink that a third person (who Pink knew to be Wooten by the description given) entered the residence and shot at Bryant with a sawed-off shot gun so Bryant shot him. Pink told the law enforcement officers "[t]hat's the way you do it gangster style, and that [Bryant] was an O.G . . . original gangster." During the subsequent videotaped interview, Pink told law enforcement officers that while he was yelling at Bryant to come, Bryant was pointing the gun at him.

Pink was charged with three counts of felony murder, with aggravated robbery as the underlying felony.

Prior to trial, Pink moved to suppress his statements alleging promises of immunity and threats by the law enforcement officers made his waiver of *Miranda* rights unknowing, and that those promises, threats, and material misrepresentations rendered his statements involuntary. The motion was denied.

Officers O'Mara and Pritchett testified at trial as to Pink's statements. Pink's ex-wife also testified at trial that Pink left with Bryant on the day in question and upon return, she heard Pink, who was crying, asked Bryant why he did it. A gun and $300-400 in cash was left in a sack at their house. Pink would not take it, but she spent the money and threw the gun into the river.

Pink testified in his own behalf and stated he and Bryant went to Wichita so Bryant could collect some money from Sambo. When unable to locate Sambo and while inside the premises on Chautauqua street, Bryant became angry when there was a conversation about Sambo's business prospering. Suddenly, Bryant jumped up and shot the man next to him. Pink stated he ran out of the house.

Pink said he grabbed a board and was going to stop Bryant, who pointed his gun at him and told him to get out. Pink went to the car. Enroute to Arkansas City, Bryant told Pink to quit being a

whimp and that if he thought Pink was going to say anything, Bryant would shoot him too.

Pink denied knowledge of what was going to happen at the residence, denied agreeing to participate in a robbery, and contended he did nothing to assist Bryant. He indicated that his statements to the law enforcement officers were the result of a promise of immunity because he was the only living witness against Bryant and, while he originally told the law enforcement officers exactly what he testified to at trial, they had suggested changes to make his statement look like he and Bryant had a plan.

Pink was found guilty as charged to three counts of felony murder and sentenced to three concurrent life sentences. Additional facts will be developed in discussing the issues on appeal.

*Batson challenge*

Pink first challenges the State's use of a peremptory strike as violating the equal protection guarantees of the Fifth and Fourteenth Amendments to the United States Constitution under the principles of *Batson v. Kentucky,* 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

A three-step analysis applies to a *Batson* challenge. The defendant must first make a prima facie showing that the prosecution has used a peremptory challenge on the basis of race. Next, if a showing is made, the burden shifts to the prosecution to articulate a race-neutral reason for striking a juror, and, finally, the court then decides whether the defendant has carried the burden of establishing purposeful discrimination. See *State v. Edwards,* 264 Kan. 177, 192, 955 P.2d 1276 (1998).

In *State v. Alexander,* 268 Kan. 610, 619, 1 P.3d 875 (2000), we stated: "Because the trial judge's findings in the context under consideration turn on evaluation of the credibility of the prosecutor, a reviewing court should give those findings great deference. *State v. Walston,* 256 Kan. 372, 378, 886 P.2d 349 (1994) (referring to *Batson*)." In *Walston,* we further stated:

" '*In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.* There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the chal-

lenge . . . [the evaluation of which] lies "peculiarly within a trial judge's province." [Citations omitted.]' " 256 Kan. at 379.

Judicial discretion is abused only when exercised in an arbitrary, fanciful, or unreasonable manner. *State v. Gardner*, 264 Kan. 95, 103-04, 955 P.2d 1199 (1998).

Here, the prosecutor used a peremptory strike to remove S.H., the only African-American prospective juror. Pink is African-American.

During voir dire, defense counsel asked a prospective juror if he believed that police officers could say things that were not true and continued with another juror by asking, "You'd agree that police officers, like anybody else, can tell the truth and they can not tell the truth?" to which the prospective juror answered, "Yes, I do." After the peremptory strike was utilized by the prosecutor to remove prospective juror S.H., the trial court found a prima facie showing had been made and the prosecutor argued that S.H. was struck because she was nodding and smiling broadly when the question of whether police officers can lie was raised. The prosecutor pointed out that from where he was sitting he could easily notice the facial expressions of this juror. Defense counsel denied seeing any smiling or nodding during that portion of this vior dire. The trial court stated: "Well, [the prosecutor] is an officer of this Court, and if he says that that's what he observed, that's what he observed; and I find that there is a nonracial reason as enumerated, although I will admit I'm very uncomfortable with it."

Pink argues that several potential jurors expressed an opinion that police officers are capable of lying but were allowed to serve on the jury and that S.H. was struck for echoing this belief while other jurors who served were not.

Pink relies on our statement from *State v. Belnavis*, 246 Kan. 309, Syl. ¶ 2, 787 P.2d 1172 (1990): "Where a prosecutor's explanation for peremptory challenges relies on characteristics of persons struck and those same characteristics are present in individuals not challenged, the explanation is not race neutral." *Belnavis*, however, is distinguishable from the facts of our case because the characteristics shown by S.H. in smiling broadly and nodding dur-

ing the questions were not equally being exhibited by the other members of the panel.

While this is not precisely a "body language" type of determination, the defense fixes its argument on the statement in *State v. Hood*, 245 Kan. 367, 374, 780 P.2d 160 (1989), that "the trial judge must be particularly sensitive when body language, alone, is advanced as a reason for striking a juror of the defendant's race."

Pink further argues that the trial court in effect abandoned its decision-making obligation when defense counsel contended that he did not see the physical actions and characteristics exhibited by S.H. and that it was improper for the court to rely on only the prosecutor's observations.

The State contends this factual situation is similar to *State v. Arteaga*, 257 Kan. 874, 896 P.2d 1035 (1995). There, after being asked whether the jurors believed the police could make a mistake, one of the prospective jurors was removed by the State when the juror immediately and affirmatively started nodding his head. While the challenge appears to have been based on the extent of the reaction, the trial court found that this was not racially motivated, and we affirmed this decision as not being an abuse of the trial court's discretion. 257 Kan. at 884-85.

We remain sensitive to the care with which body language must be viewed as a reason for the striking of a juror, *Walston*, 256 Kan. at 380-81, but our standard of review does not negate the requirement that Pink is obligated to carry the burden of establishing purposeful discrimination before the trial court. Although counsel for the State and Pink appeared not to have viewed the same behavior of S.H., it was the trial court's burden to resolve this discrepancy.

As we said in *State v. Vargas*, 260 Kan. 791, 795, 926 P.2d 223 (1996), the best evidence often will be the demeanor of the attorney who exercises the challenge, the evaluation of which lies peculiarly within the trial court's providence. The trial judge's ruling was not arbitrary, fanciful, or unreasonable or one which no judge might be expected to make. Under our standard of review, we find no abuse of discretion based on the facts of this case.

*Motion to suppress confession*

"Voluntariness of a confession is determined from the totality of the circumstances, and where a trial court conducts a full prehearing on the admissibility of extrajudicial statements by the accused, determines the statements were freely and voluntarily given, and admits the statements into evidence at trial, appellate courts accept that determination if supported by substantial competent evidence and do not attempt to reweigh the evidence. [Citation omitted.]" *State v. McCorkendale*, 267 Kan. 263, 270-71, 979 P.2d 1239 (1999).

Additionally, in *McCorkendale,* we stated:

"Factors to be considered in determining whether a confession is voluntary include: (1) the accused's mental condition; (2) the manner and duration of the interrogation; (3) the ability of the accused on request to communicate with the outside world; (4) the accused's age, intellect and background; and (5) the fairness of the officers in conducting the investigation. [Citations omitted.]" 267 Kan. at 270.

The testimony at the suppression hearing was contradictory. Pink stated he was moved from Winfield to El Dorado and placed in lock down for 5 days prior to interview. He did admit that the lock down was for an improper sexual contact with a visitor which he denied. He stated he was told by O'Mara and Pritchett that they were only interested in soliciting his help as a witness. He claimed that before he said anything, he demanded immunity and that O'Mara and Pritchett left the room and came back with a piece of paper which contained an immunity agreement. He contended that both the officers and he had signed the agreement before he signed a waiver of his *Miranda* rights and proceeded with the interviews. The issue of the officers asking Pink to change his testimony was not raised before the suppression hearing.

The State's evidence at the suppression hearing was that the visit at El Dorado was face-to-face. O'Mara and Pritchett testified that no promises or threats were made to Pink. O'Mara stated that prior to reading Pink's *Miranda* rights he asked Pink if he had used any alcohol or drugs in the past 24 hours, if he had any head injuries in the past 48 hours, if he was taken any medication, and if he wore glasses or contacts. Pink answered all those questions negatively. Pink answered affirmatively to knowing his current whereabouts. O'Mara further testified that he spoke to Pink in a normal conver-

sation. The officers' testimony indicated that the meeting lasted approximately 3 hours, with a lunch break prior to the videotaped second interview.

In reviewing the factors to be considered under *McCorkendale*, there is no question that Pink was mentally competent. He was a 29-year-old high school graduate with 1 year of college. He mentioned receiving a severe head injury when young but never contended it had any effect on the voluntariness of his statement.

The interviews were not unduly lengthy and were broken by a lunch break. On the videotape of the interview Pink did not appear to be under stress or coercion and was drinking a soda. Pink did not contend he was physically threatened or abused. He made no argument that the interviews were excessively long or the physical conditions were coercive.

Pink's waiver of *Miranda* rights was in writing and although he said, "Is my lawyer here to see me?" this statement was not a request for counsel, and Pink does not attempt to characterize it as such. He admitted he knew what his *Miranda* rights were and made no request for counsel or outside contact before speaking.

In examining the fairness of the officers conducting the interview, the question of voluntariness turns entirely on disputed issues of fact which were resolved against Pink by the trial court.

The prime question was whether there was an immunity agreement. Both officers testified that no promises were made and no immunity agreement was offered; however, Pink testified a promise of immunity was made. This difference was resolved as a credibility issue, with no evidence presented to lessen the officers' credibility. When the trial court found that no immunity agreement was offered, its determination was based upon substantial competent evidence. We said in *State v. Wonders*, 263 Kan. 582, 589, 952 P.2d 1351 (1998), that " '[s]ubstantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved.' [Citation omitted.]" We have further said that this court should not attempt to reweigh the evidence. *McCorkendale*, 267 Kan. at 271.

Although there was a direct contradiction between the testimony of Pink and the two officers, we do not reweigh this evidence as a reasonable person could have found as the trial court did that no immunity agreement was offered, and that finding will not be disturbed on appeal.

As we said in *McCorkendale*, 267 Kan. at 270, the voluntariness of a confession is determined from the totality of the circumstances. After review of all the facts, we find that the trial court's finding that Pink's interview statements were voluntary is supported by substantial competent evidence and affirm that finding on appeal.

*Aiding and abetting foreseeability instruction*

The trial court gave and Pink objected to the following instruction: "A person who intentionally aids and abets another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, if the other crime was reasonably foreseeable." This instruction follows PIK Crim. 3d 54.06.

We have stated:

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous. [Citation omitted.]" *State v. Mims*, 264 Kan. 506, 514, 956 P.2d 1337 (1998).

We have further said: " 'If jury instructions properly and fairly state the law as applied to the facts in the case when considered as a whole, and if the jury could not reasonably be misled by them, the instructions should be approved on appeal.' [Citations omitted.]" *State v. Borman*, 264 Kan. 476, 480, 956 P.2d 1325 (1998).

Pink principally argues that this instruction would allow him to be held liable for felony murder even if his only intention was to help Bryant collect a debt. Although Pink admits that collecting a drug debt could be an inherently dangerous felony, namely the money owed from the sale of marijuana under K.S.A. 21-3436(a)(14), he points out that it was never shown that the amounts

taken were from drug sales and that the instruction improperly focused the jury on the prosecution's contention without giving deference to his theory of the case.

The instruction actually focuses on the crux of the ultimate question that appears to have determined the issue of guilt in the case. Pink contended through his testimony that he went to Wichita to participate in nothing more than the collection of a debt. The prosecution's evidence, based upon Pink's statements, was that a robbery was intended and Pink knew so. This was the manner in which both the prosecutor and defense counsel centered their final arguments to the jury.

We should not as Pink suggests isolate only one instruction. Instructions Nos. 1 through 5 concern burden of proof, weight, and credibility of evidence. Numbers 6 through 8 relate to the three counts of murder for which Pink was charged, and the elements of each are set forth.

The inherently dangerous felony is listed as aggravated robbery. Instruction No. 9 explains the elements of aggravated robbery. Instruction No. 10 is the one complained of by Pink. Instruction No. 11 explains "intentional." The remaining instructions deal with procedural matters. When the complained of instruction is read with the other instructions as a whole, they make a proper statement of law as applied to the facts of this case.

The jury had been presented with Pink's evidence that he joined Bryant in Wichita to collect a debt. He admitted he knew Bryant had a gun but contended that Bryant was not going to use it to commit a robbery.

The State's evidence, on the other hand, clearly showed that Pink and Bryant went to the residence with the intent to rob the occupants and that several people were killed in a robbery "gone bad." It then became a question for the jury to determine which testimony was the most credible, and if the robbery was intended, whether the shooting deaths of the three men were reasonably foreseeable.

It is well established in Kansas that the mere presence of an accused at the time and place of crime alleged is not sufficient to make the accused guilty of the crime. *State v. Wakefield*, 267 Kan.

116, 121, 977 P.2d 941 (1999). Aiding and abetting means to knowingly associate with an unlawful venture and participate in a way which indicates the participant is willfully furthering the success of the venture. *State v. Scott*, 250 Kan. 350, 362, 827 P.2d 733 (1992).

Pink's argument that the instruction allows him to be convicted of felony murder based upon a felony which was not inherently dangerous fails in light of the other instruction, as well as the closing arguments of both counsel. The jury was required to find that Pink aided and abetted in the commission of aggravated robbery, which is an inherently dangerous felony sufficient to uphold the felony-murder conviction. See K.S.A. 21-3436(a)(4).

The disputed evidence of a claimed debt collection or lack of involvement, if believed by the jury under the instructions, would not have led to a guilty verdict. The instruction was properly given and was not erroneous.

*Mere association instruction*

Pink's defense counsel requested the following instruction, which the trial court refused to give: "Mere association with the person who actually commits the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor."

Our standard of review is as previously stated; but we have also said: "A defendant is entitled to an instruction on his or her theory of the case even though the evidence introduced thereon is slight and supported only by defendant's own testimony. [Citations omitted.]" *State v. Shortey*, 256 Kan. 166, 172, 884 P.2d 426 (1994). We have also stated: "Error cannot be predicated on a district court's refusal to give a specific instruction where the instructions given cover and include the substance of the instructions refused." *State v. Cheeks*, 253 Kan. 93, Syl. ¶ 2, 853 P.2d 655 (1993).

Included in the instruction related to the elements of aggravated robbery was the following statement, which is the essence of PIK Crim. 3d 54.05:

"As used in this instruction only, a person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, or procures another to commit a crime with intent to promote or assist in its commission is criminally

responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

It is well established under Kansas cases that the concept of "mere association" which is embodied in the instruction set forth above and the refusal of the trial court to give an additional instruction on mere association is not erroneous. *State v. Ninci*, 262 Kan. 21, 45-47, 936 P.2d 1364 (1997); *State v. Scott*, 250 Kan. 350, 361, 827 P.2d 733 (1992); *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987).

Pink acknowledges the rulings of those prior cases but contends that a different situation exists here and that when instruction No. 10 was given with the foreseeability wording, then the "mere association" instruction must also be given.

We do not agree with Pink's contention. The jury was properly instructed that under aggravated robbery, an element was taking property from the person or presence of another and a person was criminally responsible regardless of the extent of his participation if he intentionally aided, abetted, hired counsel, advised, or procured another to commit a crime with the intent to promote or assist in its commission. Instruction No. 10 on foreseeability instructed the jury that the concept was applicable to one who intentionally aids or abets another to commit a crime. Finally, the jury was given the instruction that in order to be guilty of the crime charged, it must be proved that his conduct was intentional, willful, and purposeful. These instructions adequately state that something other than Pink's mere presence was required in order to convict him of the crime charged.

The instructions did not prevent Pink's argument that while he may have accompanied Bryant to Wichita, his mere association was insufficient to establish criminal responsibility, and it was forcibly and logically argued. The jury, however, based on the evidence and instructions was justified in finding to the contrary. It was not erroneous not to give the "mere association" instruction.

*Jury questions*

K.S.A. 22-3420(3) places a mandatory duty upon the trial court to respond to the jury's request for further information as to any

part of the law or evidence arising in the case, but the manner and extent of the trial court's response rests in the sound discretion of the court. *State v. Boyd*, 257 Kan. 82, Syl. ¶ 1, 891 P.2d 358 (1995).

Prior to rendering a verdict, the jury presented to the court the following questions:

"As to #9 [the elements of aggravated robbery]:

"Is the last paragraph [the aiding and abetting instruction located at PIK Crim. 3d 54.05] a complete part of the conditions to be met numbered 1-4 or, is it separate and must also be met to satisfy #9.

"As to #10:

"If we find that #10 alone is the only condition met, is that enough to convict. Must #10 be proven alone or in conjunction with the other instructions.

"Same for #11: Does it need to be met alone or in conjunction with the other instructions.

"General:

"Do all conditions of all instructions as a whole need to be proven to justify a guilty? What if some are proven and some are not?"

After conferring with both attorneys, the court gave this response: "Instructions numbered 6, 7, 8 & 9 set forth each of the claims that must be proved in order to find the defendant guilty of felony murder."

Defense counsel suggested that the court should also reiterate instruction No. 4 that stated: "If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty" and asked that the court strike No. 10. The court expressed the desire to avoid singling out one particular instruction, especially when instruction No. 4 had not been the subject of the jury question.

Defense counsel properly raised his concerns that all the elements of the crimes had to be proved and stated: "And, I'm concerned that they feel that there's even a question at this point that they could find—not find some of the elements but then return a guilty verdict."

The argument now appears to be made on appeal that because the answer was stated in the affirmative rather than in the negative, it becomes an abuse of discretion. This is clearly a play on words, and we are not prepared to say that the trial court's response was an abuse of discretion. It restated that all of the elements of each

of the claims must be proved to find the defendant guilty, and that was a proper response.

Pink also argues that the court's response was fundamentally unfair to single out the elements that must be proved but yet not single out the instruction that would result in a not guilty finding. This argument is fundamentally flawed because the response was clearly double edged—on one hand, it could result in a guilty finding and on the other hand, if the elements did not exist, then the jury should find the defendant not guilty. The net effect was neither positive nor detrimental to Pink and was certainly not fundamentally unfair.

Viewing the response in its totality with the instructions given the jury, the trial court did not abuse its discretion in responding to the jury questions.

After review of all of Pink's contentions, we affirm his convictions.