148 P.3d 510 (2006)
STATE of Kansas, Appellee,
v.
Breland D. DAVIS, Appellant.
No. 94,366.
Supreme Court of Kansas.
December 8, 2006.
*514 Sarah Ellen Johnson, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.
Boyd K. Isherwood, assistant district attorney, argued the cause, and Nola Tedesco Foulston, district attorney, and Phill Kline, attorney general, were with him on the brief for appellee.
The opinion of the court was delivered by DAVIS, J.:
Breland Davis appeals his conviction of first-degree premeditated murder, contending that the trial court committed reversible error by: (1) admitting hearsay evidence in violation of his confrontation rights; (2) refusing to give a cautionary instruction regarding accomplice testimony; (3) refusing to instruct the jury that "mere presence" at a crime scene does not necessitate a finding of guilt; and (4) committing cumulative error that requires reversal of his conviction. Davis also claims that the trial court assessed BIDS fees without first making findings regarding his ability to pay or the financial burden the fees would impose. We affirm defendant's conviction and sentence but reverse and remand on the BIDS fees question for a hearing regarding defendant's ability to pay such fees.
The defendant, Breland D. Davis, and the victim, Maurice Williams, were friends and lived close to one another. However, a few days before the murder of Williams, the defendant became upset with Williams because Williams had not stepped in when one of their other friends was "jumped" at Davis' apartment.
John Dickerson was a cousin of the defendant, and according to all the evidence at trial he was involved in the murder of Williams. On the night of the murder, John Dickerson was at the house of Latasha Kines. She testified at trial over defendant's hearsay objection that while she was engaged in sexual intercourse with Dickerson, he received a call on his cell phone. She stated that Dickerson told her the call was from his cousin, the defendant, who she overheard saying on the phone that he "had this nigger in the house and he wanted to kill him." The objection related to the hearsay statement of Dickerson: "It is my cousin Breland." After this call, Dickerson left Kines' house and returned sometime later with defendant and others.
At Dickerson's request, Kines drove him and the others to Davis' house. The defendant followed in Dickerson's vehicle. Once they all arrived at defendant's house, Kines was told to stay in her car while the others went inside. After awhile, she left her car, went up to the house, and entered into the kitchen, where she saw blood on the kitchen floor. Dickerson again told Kines to wait in her car. The others later returned to the cars, and Kines was told to pop the trunk. She did so and felt a heavy load put in the trunk of the car. The defendant told Kines to drive to Grove Park. At the park, Kines again popped the trunk, then waited in the car as defendant and one other person carried something in a blanket; Dickerson waited outside the car. After leaving Grove Park, Kines was told to stop at a dumpster, where she popped the trunk once again and stayed in the car.
Early the next morning, a man looking for aluminum scraps in a dumpster found a rug and some sheets that he thought he would salvage for his sister. When he returned home, he saw that there was blood on the rug and sheets, so he turned them over to the authorities. When the rug was shown on the evening news with a request for information, Williams' grandfather, with whom he lived, called and identified the rug as belonging *515 to Davis. He also filed a missing person report for Williams.
A number of people testified at trial that Davis had bragged to others regarding Williams' murder. Davis' cousin, Lavelle Griffin, also testified that Davis had shown him the gun used to kill Williams, a .410 shotgun, and had explained that they put a potato over the gun to muffle the sound when Williams was shot. In addition, Griffin overheard that Williams' body was buried in Grove Park.
The victim's blood was found at the defendant's apartment and on Davis' shoelace. The victim's body was found at Grove Park, where Kines stated that Davis and the others had dumped it the night of the victim's murder. The blood on the rug and sheets found in the dumpster matched the victim's DNA.
1. Admission of Hearsay Evidence in Violation of Confrontation Rights
The defendant claims that the admission over his hearsay objection of Latasha Kines' trial testimony that Dickerson told her, "It is my cousin, Breland," violated his rights of confrontation under the United States and Kansas Constitutions. His argument rests upon State v. Bratt, 250 Kan. 264, 270, 824 P.2d 983 (1992) (citing Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 [1990]; Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 65 L.Ed.2d 597 [1980]). More specifically, the defendant argues that there was no showing that the hearsay statement was sufficiently reliable, either because it was subject to a firmly rooted hearsay exception under Kansas law or that it had other particularized guarantees of trustworthiness.
The trial court admitted Kines' testimony under the hearsay exception in K.S.A. 60-460(d)(3), explaining:
"Under the grounds alleged under K.S.A. 60-460(d)(3), [i]f the declarant is unavailable, I find that Mr. Dickerson is unavailable, as a witness, by the declarant at a time when the matter had been recently perceived by the declarant. It was almost, again, based on the purported testimony I have heard, it is almost contemporaneous with the statement being made. Mr. Dickerson's statement of what Mr. Davis had said was almost contemporaneous with that statement. While the declarant's recollection was clear, I think that would be. And was made in good faith. I have no reason to find that it wasn't made in good faith, and, again, under the circumstances shown by the purported evidence, based on statements of the attorneys, I find no incentive to . . . falsify or distort. So under (d)(3), I would allow the statement of Ms. Kines."
The above findings echo the requirements of K.S.A. 60-460(d)(3):
"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:
. . . .
"(d) Contemporaneous statements and statements admissible on ground of necessity generally. A statement which the judge finds was made . . . (3) if the declarant is unavailable as a witness, by the declarant at a time when the matter had been recently perceived by the declarant and while the declarant's recollection was clear and was made in good faith prior to the commencement of the action and with no incentive to falsify or to distort."
There is no Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), issue in this appeal since defendant concedes on appeal that the hearsay statement admitted was not testimonial. Under Crawford, "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." 541 U.S. at 68, 124 S.Ct. 1354. However, Ohio v. Roberts, 448 U.S. at 65-66, 100 S.Ct. 2531, makes it plain that in dealing with the admission of hearsay testimony and the defendant's right of confrontation under the United States Constitution, it is not enough that state law regarding hearsay evidence has been satisfied, for the Sixth Amendment Confrontation Clause can operate to bar admission of evidence that would otherwise be admissible under an exception to the hearsay *516 rule if its requirements are not met. State v. Betts, 272 Kan. 369, 383, 33 P.3d 575 (2001).
This court reviews a trial court's determination that hearsay is admissible under a statutory exception, such as K.S.A. 60-460(d)(3) here, for an abuse of discretion. "`The abuse-of-discretion standard includes review to determine that the discretion was not guided by erroneous legal conclusions.'" State v. White, 279 Kan. 326, 332, 109 P.3d 1199 (2005) (quoting Koon v. United States, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 [1996]). Davis does not challenge the trial judge's determination that Dickerson's statement was admissible under K.S.A. 60-460(d)(3).
Davis contends that the admission of this statement violated his constitutional right to confront witnesses against him. This court's confrontation analysis is undertaken without deference to the trial court's interpretation of the law. State v. Bailey, 263 Kan. 685, 697, 952 P.2d 1289 (1998). Our review of the defendant's constitutional argument is guided by the following two-step analysis under the Confrontation Clause of the United States and Kansas Constitutions:
"First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. [Citation omitted.] Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness." State v. Bratt, 250 Kan. at 270, 824 P.2d 983 (citing Idaho v. Wright, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 [1990]; Ohio v. Roberts, 448 U.S. 56, 65-66, 100 S.Ct. 2531, 65 L.Ed.2d 597 [1980]).
The required "indicia of reliability" cannot be established by reference to other evidence at trial, but must be garnered from the totality of the circumstances that surround the making of the statement in question and by virtue of the statement's inherent trustworthiness. Lilly v. Virginia, 527 U.S. 116, 138, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); Bratt, 250 Kan. at 271, 824 P.2d 983.
Availability
The defendant's argument that Dickerson was available as a witness or could have been made available as a witness through a grant of immunity by the State is wholly without merit. The trial court determined that Dickerson was unavailable based upon his claimed privilege against self-incrimination under the Fifth Amendment to the United States Constitution.
In State v. Bird, 238 Kan. 160, 708 P.2d 946 (1985), this court found that a witness who invokes his or her Fifth Amendment privilege against self-incrimination is unavailable for evidentiary purposes and for purposes of the Confrontation Clause. In Bird, the victim's wife was implicated in his murder plot. Though the wife was called as a witness for the State in the defendant's trial for murder, she refused to testify, invoking her Fifth Amendment right against self-incrimination. The trial court then admitted other witnesses' testimony of the wife's previous statements.
Our decision in Bird is fully in accord with the definition of unavailability under Kansas' hearsay statutes. K.S.A. 60-459(g)(1), which defines "`[u]navailabil[ity] as a witness,'" states that a witness is unavailable if he or she is "exempted on the ground of privilege from testifying concerning the matter to which his or her statement is relevant." The Kansas Court of Appeals discussed this provision and its relation to a defendant's confrontation rights in State v. Giles, 27 Kan. App.2d 340, 4 P.3d 630, rev. denied 269 Kan. 936 (2000):
"Under K.S.A. 60-459(g)(1), a declarant is unavailable as a witness if he or she is exempted on the ground of privilege in testifying. In this state, the law is clear that a witness who invokes his or her Fifth Amendment privileges in refusing to testify is `unavailable' under 60-459(g)(1). State v. Bird, 238 Kan. 160, 174, 708 P.2d *517 946 (1985); State v. Oliphant, 210 Kan. 451, 453-54, 502 P.2d 626 (1972). It is apparent, therefore, . . . that the victim in this case, in refusing to testify on the basis of her Fifth Amendment privilege, was unavailable as a witness." 27 Kan.App.2d at 343, 4 P.3d 630.
The defendant argues that State v. Montanez, 215 Kan. 67, 523 P.2d 410 (1974), supports his contention. However, in Montanez, a witness invoked his Fifth Amendment right in the middle of his testimony at trial; the court ordered that all of the witness' testimony be stricken. 215 Kan. at 68-69, 523 P.2d 410. This court held that the trial court did not abuse its decision in striking the witness' entire testimony. 215 Kan. at 73, 523 P.2d 410. Thus, contrary to Davis' contentions, Montanez does not support his argument that a court should compel a witness to testify and then strike his or her statements if the defendant invokes his or her Fifth Amendment privilege. The witness in Montanez, unlike Dickerson in this case, was already testifying on direct examination when he invoked the privilege against self-incrimination. More importantly, Montanez did not involve a question of unavailability, but rather the propriety of a trial court's decision to strike a witness' testimony. Finally, Montanez acknowledges that in cases involving both a defendant's confrontation rights and a witness' privilege against self-incrimination:
"There is no necessity for resolution of the problem by weighing each in the scales. Each can be respected and protected. Generally it may be said a trial court is required to protect an accused's right of confrontation short of compelling the witness against him to abdicate his privilege of self-incrimination. [Citation omitted.]" (Emphasis added.) 215 Kan. at 69-70, 523 P.2d 410.
We conclude that Dickerson was unavailable based upon his claim of privilege under both the Kansas and United States Constitutions. The trial court was obligated under the facts of this case to protect Dickerson's Fifth Amendment privilege, thereby making him unavailable as a witness.
Reliability of Hearsay Evidence
In order to protect criminal defendants' confrontation rights at trial, this court has held that a nontestimonial hearsay statement is admissible only if the witness is unavailable and the witness' statement "bears adequate indicia of reliability." Bratt, 250 Kan. at 270, 824 P.2d 983. The Bratt court, citing Wright, explained that

"particularized guarantees of trustworthiness required for admission of a hearsay statement under the Confrontation Clause must be shown from the totality of the circumstances that surround the making of the statement and that render the declarant particularly worthy of belief. [Citation omitted.] Because evidence possessing particularized guarantees of trustworthiness must be at least as reliable as evidence admitted under a firmly rooted hearsay exception, evidence admitted under the former requirement must similarly be so trustworthy that adversarial testing would add little to its reliability. [Citation omitted.]" (Emphasis added.) 250 Kan. at 271, 824 P.2d 983.
Thus, while reliability can be "inferred" when a statement falls within a firmly rooted hearsay exception, if the statement does not fall within such an exception, the court must make a determination that it has "particularized guarantees of trustworthiness." 250 Kan. at 270, 824 P.2d 983 (citing Roberts, 448 U.S. at 66, 100 S.Ct. 2531).
For evidence of the statement to qualify as a hearsay exception under K.S.A. 60-460(d)(3), a judge must determine (1) that the declarant is unavailable as a witness; (2) that the statement was made at a time when the matter was recently perceived by the declarant and the declarant's recollection was clear; and (3) that the statement was made in good faith prior to the commencement of the action and the declarant had no incentive to falsify or distort. State v. Sanders, 258 Kan. 409, 421, 904 P.2d 951 (1995). As indicated above, the trial court made these findings with regard to Dickerson's statement.
We do not believe that the hearsay exception under K.S.A. 60-460(d)(3) is a firmly *518 rooted hearsay exception under Kansas law. Bailey, 263 Kan. at 695, 952 P.2d 1289; State v. Rodriguez-Garcia, 27 Kan.App.2d 439, 444, 8 P.3d 3 (1999), rev. denied 269 Kan. 939 (2000). At the same time, it is included as part of the Kansas Rules of Evidence, which indicates the legislature's long-standing recognition of its trustworthiness. As pointed out above, however, not all exceptions in the statute are "firmly rooted" for confrontation purposes. This court explained with regard to the reliability of statements admitted under K.S.A. 60-460(d)(3):
"The hearsay exception at issue in the present case would seem to lie somewhere between the hearsay exceptions carved out for child victims [which are not firmly rooted hearsay exceptions] and the preliminary hearing testimony in Roberts. It is richer in indicia of reliability than a small child's statement on a grown-up subject, but it lacks some indicia of reliability that one would associate with cross-examined testimony. It is included as part of the Kansas Rules of Evidence, which indicates the legislature's longstanding recognition of its trustworthiness. We question whether K.S.A. 60-460(d)(3) meets the above criterion of a `firmly rooted' hearsay exception for confrontation purposes." Bailey, 263 Kan. at 695, 952 P.2d 1289.
We must focus upon the nontestimonial hearsay statement itself, and with no deference to the trial court, to determine whether such statement possesses "particularized guarantees of trustworthiness."
The trial court made no specific finding regarding whether Dickerson's statement was trustworthy for confrontation purposes. The State urges on appeal that, inherent in the trial court's analysis of K.S.A. 60-460(d)(3)  including the question of whether Dickerson had an incentive to falsify or distort  was a finding that the statement was sufficiently trustworthy under the Confrontation Clause. Our review of this question is not governed by K.S.A. 60-460(d)(3), but rather by the following standard provided by the United States Supreme Court:
"Nothing in our prior opinions, however, suggests that appellate courts should defer to lower courts' determinations regarding whether a hearsay statement has particularized guarantees of trustworthiness. To the contrary, those opinions indicate that we have assumed, as with other fact-intensive, mixed questions of constitutional law, that `[i]ndependent review is . . . necessary . . . to maintain control of, and to clarify, the legal principles' governing the factual circumstances necessary to satisfy the protections of the Bill of Rights. [Citation omitted.] We, of course, accept the Virginia courts' determination that [the declarant's] statements were reliable for purposes of state hearsay law, and, as should any appellate court, we review the presence or absence of historical facts for clear error. But the surrounding circumstances relevant to a Sixth Amendment admissibility determination do not include the declarant's in-court demeanor (otherwise the declarant would be testifying) or any other factor uniquely suited to the province of trial courts. For these reasons, when deciding whether the admission of a declarant's out-of-court statements violates the Confrontation Clause, courts should independently review whether the government's proffered guarantees of trustworthiness satisfy the demands of the Clause." Lilly v. Virginia, 527 U.S. at 136-37, 119 S.Ct. 1887.
Lilly rejected the contention that "`evidence corroborating the truth of a hearsay statement may properly support a finding that the statement bears "particularized guarantees of trustworthiness."' [Citation omitted.]" 527 U.S. at 137-38, 119 S.Ct. 1887. The Lilly Court explained that, "`[t]o be admissible under the Confrontation Clause,' . . . `hearsay evidence used to convict a defendant must possess indicia of reliability by virtue of its inherent trustworthiness, not by reference to other evidence at trial.'" (Emphasis added.) 527 U.S. at 138, 119 S.Ct. 1887 (quoting Wright, 497 U.S. at 822, 110 S.Ct. 3139).
Applying the above test, Lilly held that statements of a nontestifying accomplice were unreliable where "the government [was] involved in the statements' production" and where "the statements describe[d] past events and have not been subjected to adversarial *519 testing." 527 U.S. at 137, 119 S.Ct. 1887.
Dickerson's statement, "It is my cousin, Breland," was a spontaneous response to the telephone call and certainly an expected statement, given the fact that Kines and Dickerson were involved in the act of sexual intercourse at the precise moment the call was received. As found by the trial court, the matter was recently perceived by the declarant, Dickerson, "almost contemporaneous with the statement being made." The statement was made in good faith, and the trial court concluded that there was no intent to falsify or distort. Such findings, taken with the immediate circumstances surrounding the utterance of the statement by Dickerson and without consideration of any other trial evidence, convince this court the statement possessed the guarantees of trustworthiness demanded by the Sixth Amendment. We acknowledge that this issue presents a close question, but we conclude that the admission of Dickerson's statement was inherently trustworthy and that its admission did not violate the defendant's confrontation rights under the Sixth Amendment to the constitution.
The fact that such a statement was made to Kines rather than the government is also significant and bolsters the statement's credibility in the eyes of Lilly. It is important to note as well that, at the time of the statement by Dickerson to Kines, no crime had been committed, and there was no evidence presented at trial that Dickerson knew of defendant's desire for help in a plan to murder the victim. His response, according to the trial court, was made in good faith with no intent to falsify or distort. Any argument that Dickerson might have intended to shift the blame from himself is difficult to sustain in light of the fact that at the moment he received the call, he apparently knew nothing of what his cousin might say.
While we conclude here that the admission of Dickerson's statement did not violate the Confrontation Clause, it would have been desirable for the trial court to have made independent findings of trustworthiness, rather than echo the provisions of K.S.A. 60-460(d)(3). The risk run by the trial court in not making such independent inquiries of trustworthiness in the absence of a firmly rooted hearsay exception is reversal, for the Confrontation Clause, as a condition for admission of hearsay against a defendant in a criminal trial, requires that such hearsay possess guarantees of trustworthiness. In this case we are not required to reverse because, based upon the trial court's findings and the totality of circumstances surrounding the giving of the statement, we are able to conclude that the statement meets the requirements for admission under the Sixth Amendment.
Because the question is a close one, we think it appropriate to discuss as well that the admission of Dickerson's statement, if one assumes error, was harmless error. The test for determining whether an error of constitutional magnitude is harmless is as follows:
"`An error of constitutional magnitude is serious and may not be held to be harmless unless the appellate court is willing to declare a belief that it was harmless beyond a reasonable doubt. Thus, before an appellate court may declare the error harmless, it must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial.' [Citation omitted.]" State v. Brown, 280 Kan. 65, 77, 118 P.3d 1273 (2005).
Here, the evidence against Davis  apart from Dickerson's statement to Kines that it was Davis on the phone  was overwhelming. The victim's blood was found at the defendant's apartment and on Davis' shoelace. The victim's body was found at Grove Park, where Kines indicated that Davis and the others had dumped it the night of the victim's murder. The blood on the rug and sheets found in the dumpster matched the victim's DNA. Finally, there was testimony from other witnesses that Davis had made statements to others regarding his participation in the murder. Davis showed Griffin the shotgun that was used to kill the victim and described how the murder took place.
Davis contends that the admission of Dickerson's statement cannot be harmless, because *520 it provided evidence of his premeditation. While this may be the case, other witnesses also testified that Davis had killed the victim because the victim had failed to stand up for Davis' friend Chris Tuggle in a fight a few days earlier. Thus, even assuming constitutional error, such error is most certainly, under the above test, harmless.
2. Refusal to Give an Accomplice Instruction
Davis claims the trial court committed reversible error when it refused to grant his request for a cautionary instruction on accomplice testimony regarding Kines' trial testimony. When considering the refusal of the trial court to give a specific instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. State v. Lutter, 27 Kan.App.2d 858, 860, 10 P.3d 16, rev. denied 270 Kan. 902 (2000).
"A trial court has discretion in giving instructions to the jury. On appeal, the instructions should be approved if, after being considered in their entirety, they properly and fairly state the law as applied to the facts. [Citation omitted.] . . . When reviewing challenges to jury instructions, the instructions are to be considered together and read as a whole without isolating any one instruction. If the instructions properly and fairly state the law as applied to the facts in the case, and if the jury could not reasonably have been misled by them, then the instructions do not constitute reversible error although they may be in some small way erroneous. [Citation omitted.]" State v. Johnson, 255 Kan. 252, 256-57, 874 P.2d 623 (1994).
The requested instruction, PIK Crim.3d 52.18, pertains to accomplice witness testimony and specifically provides that it applies to witnesses who testify that they were "involved in the commission of the crime with which the defendant is charged." Thus, the threshold question is whether Kines can be considered an "accomplice" within the meaning of the instruction. The relevant case law suggests that she cannot.
This court has explained that, "[a]s to the accomplice instruction, PIK Crim.3d 52.18 defines an accomplice as one who testifies that he or she was involved in the commission of the crime with which the defendant is charged." State v. Abel, 261 Kan. 331, 336, 932 P.2d 952 (1997), disapproved in part on other grounds State v. Mathenia, 262 Kan. 890, 898-99, 942 P.2d 624 (1997). In that case, the defendant Abel was charged with and convicted of felony murder, aggravated burglary, and aggravated robbery. On appeal, Abel asserted that the trial court should have provided the cautionary accomplice instruction regarding two of the State's witnesses. This court summarily rejected Abel's argument, finding that the contention that "an accomplice instruction was required fails as there was no testimony that either [witness] acted as [an accomplice] in the murder, aggravated burglary, or aggravated robbery charged." 261 Kan. at 336, 932 P.2d 952; see also State v. Noriega, 261 Kan. 440, 447, 932 P.2d 940 (1997), disapproved in part on other grounds State v. Mathenia, 262 Kan. 890, 898-99, 942 P.2d 624 (1997) ("Noriega's argument that an accomplice instruction was required fails as there was no testimony that either [witness] acted as [an accomplice] in the murder, aggravated burglary, or aggravated robbery charged.").
Similarly, in State v. Humphery, 267 Kan. 45, 47, 978 P.2d 264 (1999), the defendant was convicted of felony murder, aggravated burglary, and criminal possession of a firearm. At his trial, Simmons, a witness for the State, testified that she was present when the victim was killed and identified Humphery as the killer. Another witness, Kelsey, also testified that he was present and identified Humphery as the shooter. On appeal, the defendant argued that, while it was not requested, the court should have given an accomplice instruction with regard to these two witnesses' testimony. 267 Kan. at 62, 978 P.2d 264.
This court rejected the defendant's argument that an accomplice instruction was required, because the witnesses were not accomplices within the meaning of the instruction. 267 Kan. at 62-63, 978 P.2d 264. The Humphery court explained:

*521 "Simmons does not fit the definition of an accomplice. . . . The entire basis of her testimony was that she had sex with [the victim] and directed him to drive to [the place where he was shot], but she was not involved in the robbery or the murder in any way. Some of the evidence presented at trial could sustain the inference that Simmons was involved in the crime, but she is not an accomplice as contemplated by the jury instruction on accomplices. . . . Further, it cannot be said that Simmons or Kelsey were accomplices under a conspiracy theory because there was no evidence of a conspiracy." 267 Kan. at 62-63, 978 P.2d 264.
In State v. Gholston, 272 Kan. 601, 35 P.3d 868 (2001), cert. denied 536 U.S. 963, 122 S.Ct. 2672, 153 L.Ed.2d 845 (2002), where Gholston was convicted of first-degree murder, this court again held that an accomplice instruction was not required where there was no evidence that the witness in question was an accomplice. At trial, the court admitted both live testimony and tape-recorded statements of Berger, who had at one time been "considered by the police as an accomplice in the shooting." 272 Kan. at 616, 35 P.3d 868. Apparently, at some time prior to trial, the detective on the case had threatened to prosecute Berger for the crime of accessory to murder if she did not cooperate. Berger later testified that she was with Gholston the night of the shooting and had gone with him and a group to the convenience store, and identified Gholston as the shooter.
Among other arguments, Gholston argued on appeal that the court should have given the cautionary instruction regarding accomplice testimony with reference to Berger's statements. This court reasoned that
"although [the detective] Hennessy told Berger that her actions on the night of the shooting could result in the charge of murder as an aider and abettor, there is no evidence that Berger had knowingly associated or participated in the crime. . . . In statements to Gholston's attorney, Berger stated that she never saw the gun in the car, she never saw Gholston get out of the car with a gun, and she never saw the gun until she saw Gholston shooting. In a taped interview with Hennessy, Berger stated that she did not know Gholston had a gun until the shooting started." 272 Kan. at 618, 35 P.3d 868.
In light of the lack of evidence that would link Berger as an accomplice, this court held that "the judge was not required to give an accomplice instruction." 272 Kan. at 618, 35 P.3d 868.
The record establishes that Kines was not "involved in the commission of the crime with which [Davis was] charged," and thus was not an accomplice within the meaning of the requested instruction. There is no evidence that Kines was present at the time that the victim was murdered, nor was she involved in the planning of the murder. Davis argues that Dickerson may have made statements that Kines was present at the time of the killing, but these "statements" were only mentioned at trial in the form of a cross-examination question by Davis' counsel:
"Q. [Defense Counsel] . . . Did Detective Chisholm also tell you that John said you were present during the shooting?
"A. [Kines] Yes.
"Q. Was that true?
"A. No.
. . . .
"Q. So you weren't there when the shooting happened?
"A. No."
This implication by Davis' counsel offers no substantive evidence that Kines was present when the victim was killed. On the contrary, the only evidence at trial regarding Kines' whereabouts and involvement was offered by Kines herself; she testified that she was not present. Moreover, there was no evidence that she otherwise participated in the planning or commission of the murder, other than the events, described in her testimony, which occurred "after the fact."
Defendant argues that being a mere accessory after the fact is enough to warrant an accomplice instruction. Defendant relies upon State v. Rakestraw, 255 Kan. 35, 871 P.2d 1274 (1994), where this court reversed the defendant's conviction of second-degree murder because the trial court erred by admitting a redacted, out-of-court statement of *522 the defendant, depriving him of a fair trial. 255 Kan. at 35, 46, 871 P.2d 1274. In addition to its holding, this court also agreed that the trial court should have provided an accomplice instruction with regard to statements made by a witness named Harris. 255 Kan. at 46, 871 P.2d 1274. The Rakestraw court explained in this regard:
"At trial, the defendant requested an accomplice instruction, but the trial judge denied the request on the basis that being charged as an accessory would not make Harris an accomplice. Only if Harris had been charged with the same crime would he have been an accomplice. While it is true that Harris was not charged with murder, Billingsley [a codefendant] at least implicated Harris in the beating. Although Billingsley denied witnessing the beating, he placed Harris at the scene, and his defense counsel tried to cast doubt on Harris' claim that he was not involved in the fight and was spattered with blood only while trying to render aid to the victim. Upon remand, it would be appropriate for the trial court to grant the defendant's request and give the cautionary instruction on accomplice testimony. We need not and do not decide whether the failure to give such an instruction was reversible error. We do conclude that the question is close enough for us to advise the court to give a cautionary instruction on accomplice testimony if Harris testifies at the new trial." 255 Kan. at 46, 871 P.2d 1274.
Davis argues that these statements in Rakestraw indicate that this court has "recognized the propriety of giving the cautionary instruction in cases where the witness' testimony would only render the witness an accessory after the fact, not an aider and abettor." Davis misconstrues Rakestraw, which explained that the accomplice instruction would be appropriate because there was evidence and testimony at trial that indicated that the witness was involved in the commission of the murder. Furthermore, this court did not state that a failure to provide the instruction, even when it was requested in such circumstances, was reversible error. Instead, the court counseled that an accomplice instruction would be "appropriate" in the new trial. See 255 Kan. at 46, 871 P.2d 1274. Thus, Rakestraw provides no basis for Davis' argument here that Kines' participation in events after the murder would make her an accomplice within the meaning of the instruction.
According to Davis' brief, "[w]hether [Kines] actually admitted to being involved before the murder is irrelevant to the analysis. She was, by her own testimony, involved in the events of that evening." This court has specifically rejected the idea that mere "involvement in events" makes a witness an accomplice within the meaning of PIK Crim.3d 52.18. See Gholston, 272 Kan. at 618, 35 P.3d 868. Instead, the witness must have been involved in the commission of the crime with which the defendant is charged. There is no evidence here to support Davis' claim that Kines was an accomplice within the meaning of PIK Crim.3d 52.18. Thus, the accomplice instruction was neither required nor appropriate.
3. Refusal of a Mere Presence Instruction
Davis also asserts that this court should reverse due to the trial court's refusal to provide an instruction that mere presence at the crime scene is not evidence of guilt. While Davis did not submit jury instructions before trial, his counsel at trial requested that such an instruction be given. The court agreed that the proposed "mere presence" instruction was a correct statement of the law, but refused to give the instruction since it was already giving the aiding and abetting instruction under PIK Crim.3d 54.05. However, the court did state that Davis' counsel could describe the law on "mere presence" in his closing argument, which he later did.
The aiding and abetting instruction provided by the trial court, stated:
"A person who, either before or during its commission, intentionally aids, abets, advises, hires, counsels, [or] procures another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's *523 participation, if any, in the actual commission of the crime."
See PIK Crim.3d 54.05.
In general, when considering the refusal of the trial court to give a specific instruction, the evidence is viewed in the light most favorable to the party requesting the instruction. State v. Lutter, 27 Kan.App.2d 858, 860, 10 P.3d 16, rev. denied 270 Kan. 902 (2000). In cases where a defendant objects to instructions, this court is required to consider the instructions as a whole and not isolate any one instruction. State v. Edgar, 281 Kan. 47, 54, 127 P.3d 1016 (2006). "`"If the instructions properly and fairly state law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some way erroneous."'" State v. Mays, 277 Kan. 359, 378-79, 85 P.3d 1208 (2004) (quoting State v. Peterson, 273 Kan. 217, 221, 42 P.3d 137 [2002]).
Davis' proposed instruction is a correct statement of the law that "mere presence of an accused at the time and place of the crime alleged is not sufficient to make the accused guilty of a crime." State v. Wakefield, 267 Kan. 116, 121, 977 P.2d 941 (1999). While an appellate court must usually view the evidence in the light most favorable to the defendant when a proposed instruction has been refused, this court has specifically stated that a "mere presence" instruction need not be included when the trial court provides the aiding and abetting instruction in PIK Crim.3d 54.05. State v. Hunter, 241 Kan. 629, 638-39, 740 P.2d 559 (1987). In Hunter, this court explained that previous cases had held that "the PIK instruction given clearly informed the jury that intentional acts by a defendant must be proved to convict for aiding and abetting and, thus, proof of mere association or presence would be insufficient to convict. Therefore, the refusal to give defendant's requested instruction was not error." 241 Kan. at 639, 740 P.2d 559.
This court had the opportunity to reconsider the Hunter rule in State v. Pink, 270 Kan. 728, 738-39, 20 P.3d 31 (2001), in the context of a similar proposed instruction that "mere association" does not establish guilt as an aider or abettor. Instead of reversing Supreme Court precedent, the Pink court found that "[i]t is well established under Kansas cases that the concept of `mere association' which is embodied in the instruction set forth above and the refusal of the trial court to give an additional instruction on mere association is not erroneous. [Citations omitted.]" 270 Kan. at 739, 20 P.3d 31. Thus, the court held that the trial court's refusal to give a "mere association" instruction was not error.
Davis acknowledges that our decision in Hunter states that the trial court was not required to give his proposed instruction, but nevertheless argues that this decision should be "reconsidered." According to Davis in his brief, "[s]ome jurors may be inclined to apply the idea of guilt by association," and "the jury should have as much information of and guidance on the law as possible" to prevent misunderstanding. Because the "mere presence" instruction would have been a correct statement of the law, Davis argues that "[t]here simply is no good reason for refusing to give the instruction."
We disagree and reject defendant's request to reexamine our holding in Hunter. The defendant's argument is based upon speculation that a jury might convict based upon defendant's mere presence. However, this court has stated that "[j]uries are presumed to have followed the instructions given by the trial court. [Citation omitted.]" State v. Tyler, 251 Kan. 616, 638, 840 P.2d 413 (1992). In addition, this court has explained that "[e]rror cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused. [Citations omitted.]" State v. Osbey, 238 Kan. 280, 286, 710 P.2d 676 (1985). There is no evidence that any of the jurors actually misunderstood the requirement that the State must prove intentional acts to prove guilt. We conclude that the aiding and abetting instruction adequately encompassed the "mere presence" rule, and that it was not reversible error for the trial court to refuse to give the instruction in this case.
*524 4. Cumulative Error
Davis next argues that, even if the events described in Issues I through IIIthe admission of Kines' testimony regarding John Dickerson's statement, "It is my cousin Breland," when he received a phone call; the trial court's refusal to give a cautionary instruction regarding accomplice testimony; and the trial court's refusal to give an instruction that "mere presence" does not amount to guiltwere not in and of themselves reversible error, the cumulative effect of these events denied Davis his right to a fair trial.
In State v. Ackward, 281 Kan. 2, 29, 128 P.3d 382 (2006), this court recently explained:
"Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied him a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. [Citation omitted.]"
With the exception of the final assignment of error by the defendant, the record simply does not support all other errors raised, and therefore the record does not support a claim of cumulative error.
5. BIDS Fees Assessment and Ability to Pay
In his final issue raised on appeal, Davis asserts that the trial judge improperly assessed fees to be paid to the Board of Indigents' Defense Services (BIDS), including $7,000 in attorney fees and $50 in administrative costs, without first considering the financial resources of Davis or the burden that the fees would impose.
At sentencing, the trial judge did not discuss the BIDS fees or attorney fees at any length, but simply assessed against Davis, among other court costs and compensation, "$7,000 as partial reimbursement to the State of Kansas for the cost of your court appointed attorney" and a "$50 fee to BIDS. That's the Board of Indigent [sic] Defense Services in Topeka. . . ." The judge did not explain the origins of these numbers, nor did he make any findings on the record regarding Davis' ability to pay the fees. Davis now argues that, because the trial court failed to make these findings, this court should reverse the judge's assessment of the BIDS fees against him. We agree.
This court recently resolved these issues in State v. Robinson, 281 Kan. 538, 132 P.3d 934 (2006). In that case, Robinson was convicted of felony possession of marijuana and misdemeanor possession of drug paraphernalia. In addition to his incarceration and probationary sentences, the sentencing court assessed BIDS attorney and administrative fees of $745 and $50, respectively. Robinson challenged the assessment of these fees on the ground that the sentencing judge failed "to explicitly consider [his] ability to pay and the financial burden payment would impose at the time of the assessment," and claimed a due process violation because the judge did not consider the validity of the fees. 281 Kan. at 539, 132 P.3d 934.
On appeal, this court rejected the due process claim but reversed the trial court's assessment of the BIDS fees on Robinson's first claim. 281 Kan. at 548, 132 P.3d 934. In particular, the court held that a trial court must consider a defendant's ability to pay and the hardship that a fee would impose at the time payment is ordered. 281 Kan. at 543, 132 P.3d 934. As the Robinson court explained:
"The language of K.S.A.2005 Supp. 22-4513(b) clearly requires a sentencing judge, `in determining the amount and method of payment' of BIDS reimbursement, i.e., at the time the reimbursement is ordered, to `take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose.' The language is mandatory; the legislature stated unequivocally that this `shall' occur, in the same way that it stated unequivocally that the BIDS fees `shall' be taxed against the defendant. Compare K.S.A.2005 Supp. 22-4513(a), (b). The language is in no way conditional. There is no indication that the defendant must first request that the sentencing *525 court consider his or her financial circumstances or that the defendant must first object to the proposed BIDS fees to draw the sentencing court's attention to those circumstances." 281 Kan. at 543-44, 132 P.3d 934.
The Robinson court also rejected the State's waiver argument where the State argued, as it does here, that the waiver provision in K.S.A.2005 Supp. 22-4513(b) indicates that an assessment of a defendant's ability to pay and the financial burden imposed by a fee should be assessed after a defendant has petitioned for waiver of an assessed BIDS fee. This court explicitly found this argument to be without merit. According to the court's reasoning, "the fact that the statute also permits a defendant to petition for waiver does not change the mandatory language or mean the waiver procedure is intended as a substitute for the sentencing court's initial consideration of a defendant's finances." 281 Kan. at 544, 132 P.3d 934.
The court concluded its discussion of Robinson's BIDS fees with three instructions regarding the proper application of its ruling:
"First, the sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose explicitly, stating on the record how those factors have been weighed in the court's decision. Without an adequate record on these points, meaningful appellate review of whether the court abused its discretion in setting the amount and method of payment of the fees would be impossible. [Citation omitted.]
"Second, a sentencing court's failure to include such explicit consideration of the defendant's financial circumstances in the record does not render the sentence associated with the resulting assessment `illegal,' as that term is used in K.S.A. 22-3504. As we have already said, the assessment itself is not punitive; it is not a punishment or part of the sentence at all. . . .
"Third, and finally, we . . . recognize that subsection (a) of K.S.A.2005 Supp. 22-4513 states that taxation of `all expenditures' by BIDS shall occur and that neither subsection (a) nor subsection (b) explicitly states consideration of a defendant's financial resources must occur `at sentencing.' However, reading the subsections together, this is their practical effect. The consideration must occur, and sentencing is the proceeding that routinely addresses BIDS reimbursement." (Emphasis added.) 281 Kan. at 546-47, 132 P.3d 934.
In the instant case, the sentencing judge made no explicit, on-the-record finding at the original assessment of BIDS fees against Davis regarding his ability to pay the fees or the financial burden the fees would impose. The statutory framework under which Davis' BIDS fees were imposed was identical to that discussed in Robinson. Thus, while the sentencing court's failure to make on-the-record findings regarding Davis' fees does not affect the legitimacy of Davis' conviction or sentence, it nevertheless is cause for reversing the court's BIDS assessment. We therefore reverse the BIDS assessment and remand for an assessment consistent with this court's opinion in Robinson.
The conviction of defendant is affirmed; the BIDS assessment is set aside, and the case is remanded for an assessment consistent with Robinson.