No. 96,744

STATE OF KANSAS, *Appellee*, v. DUSTIN O. HOLT, *Appellant*.

(175 P.3d 239)

Opinion filed February 1, 2008.

*Janine Cox,* of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Lee J. Davidson,* assistant attorney general, argued the cause, and *Paul J. Morrison,* attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Dustin O. Holt appeals his jury convictions of first-degree premeditated murder and conspiracy to commit murder. He also appeals his sentences, which were consecutive: life in prison without the possibility of parole for 25 years for the murder and 131 months' imprisonment for the conspiracy. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the trial court err in its jury polling when each juror was asked, "Is this the verdict of the jury?" No.

2. Did the trial court err when it refused Holt's request to add the "mere presence or association" language to the jury instruction on aiding and abetting? No.

3. Did the trial court err when it overruled Holt's objection to the giving of an aiding and abetting instruction? No.

4. Did the trial court err when it instructed the jury that Holt could be convicted as an aider and abettor, even though the State's theory was that he was the shooter? No.

5. Did the trial court err when it ordered Holt to reimburse the State Board of Indigents' Defense Services (BIDS) for attorney fees? Yes.

6. Did the trial court err when it used Holt's prior convictions to calculate his criminal history score? No.

Accordingly, we affirm the convictions and sentences, but remand to the district court for redetermination of the BIDS fee reimbursement.

## FACTS

Unless otherwise noted, the following facts are taken from the testimony of Dustin Holt's paramour, Lisa Shoffner, and his friend, Landrey Casey, at Holt's jury trial. Holt did not testify.

In January 2005, Kenton and Lisa Shoffner's blended family lived south of I-70 on the border of Shawnee and Wabaunsee Counties. The property contained a two-story home and a large garage.

Kenton and Lisa each brought three children into the marriage. They had one child together, Samantha, who was killed in an accident in 1999. Following Samantha's death, Lisa began self-medicating, using methamphetamine over the next 5 years. She began carrying Kenton's revolver under the front seat of her car for protection from the drug users with whom she was interacting.

On December 31, 2004, the Shoffners invited some friends to their home to celebrate New Year's. Lisa's friend Michelle Smith, Smith's boyfriend John Berry, and Holt attended. This was the first time Lisa had met Holt. According to Lisa, she and Holt began a

sexual relationship that night. For the next 10 days, Lisa spent most of her time with Holt away from home.

On January 7, 2005, Lisa received a cell phone call from her daughter Crystal. Crystal told Lisa that Kenton was angrily yelling at her about Lisa because Lisa was spending so much time away from home. Kenton's comments "pissed [Lisa] off" and after hanging up the phone, Lisa told Holt that she wanted to kill her husband.

Two days later, Lisa and Holt picked up Holt's friend Landrey Casey. This was the first time Lisa and Casey met, although they had talked to each other on the phone. According to Lisa, she told Holt and Casey that her husband had a $50,000 life insurance policy. According to Casey, Holt told him that Lisa wanted her husband "knocked off" and asked if Casey was willing to help them for part of the $50,000. Casey also testified that Lisa told him that she had some bruises from Kenton.

Lisa later took her friend Dawn Gilley to Lisa's home to do some laundry. Holt rode with them. Lisa introduced Holt to Kenton, saying Holt's name was Jim. Holt, Lisa, and Dawn returned to Topeka; Lisa and Holt then slept at Dawn's house for awhile.

Upon awakening, Lisa learned that while they were sleeping, Kenton had called Dawn and told her that he was going to call the cops because they were doing dope. He also told Dawn that she should stay away from Lisa.

Holt and Lisa met Casey later that evening. They bought methamphetamine with $30 Casey received from his girlfriend Shawna and smoked some of it before going to Shawna's house. Lisa claims that shortly after arriving, she told the others that she needed to go home to check on her kids. Casey and Holt went with her. Casey testified that as Lisa paid for a gas stop along the way, Holt pulled out the gun from under her front seat and showed it to Casey. According to Casey, Holt also told him that Kenton had been threatening to shoot Lisa.

Lisa testified that the group's plan was to park in Kenton's garage upon arrival at the Shoffner's house. Holt and Casey were to remain there while Lisa went into the house to lure Kenton outside. According to Lisa, after she parked in the garage around midnight,

Holt told her to get Kenton as close as possible to the blanket that hung in the garage doorway.

Lisa went into the house and started arguing with Kenton, bringing up the prior phone call she had received from Crystal. She then said she was going to the garage to smoke dope and started walking in that direction. Kenton followed closely behind her.

According to Casey's trial testimony, as Kenton pulled back the blanket, Casey said to him, "What's up dog? What the fuck you gonna do now?" Kenton said, "No," and Casey told Holt to "bust on him." Casey claims that Holt then shot Kenton in the chest with Kenton's own revolver. Kenton fell to the ground, and Casey told Holt to shoot him again. Holt then shot Kenton in the face at pointblank range.

At trial, Lisa testified that she did not remember a lot about the shooting because she was highly medicated at the time. She said she heard two shots but did not see who was holding the gun.

Casey testified that Holt drove off in Kenton's pick-up as Casey scrambled to get in. The plan had called for Lisa to wait to call 911 until Holt and Casey got to Topeka. Instead, she panicked and called 911 as the pick-up was turning out of the driveway. Lisa lied to the dispatcher and the first law enforcement officers on the scene, claiming she did not know the assailants.

Holt and Casey were apprehended shortly thereafter. Due to the icy weather, the pick-up slid off the road and got stuck in a ditch. When Shawnee County Sheriff's Deputy Hawks heard the dispatch call of the shooting on the radio, he recognized the name "Shoffner." When he encountered Holt and Casey walking along I-70 toward Topeka, he recognized them from a traffic stop a few days earlier when he had issued Lisa a warning for a tag-light violation. Deputy Hawks then notified other law enforcement officers. The murder weapon was soon found in the highway ditch nearby.

By the end of the month, the State filed a complaint charging Casey, Holt, and Lisa each with one count of first-degree murder and one count of conspiracy to commit first-degree murder. The State also charged Casey and Holt with one count of theft for the pick-up.

Casey eventually pled guilty to an amended complaint charging him with aiding a felon, conspiracy to commit aggravated battery, possession of methamphetamine, and felony theft. Although he had not been sentenced at the time of Holt's trial, he expected to be sentenced to an underlying term of 3 years, but would only have to serve probation. Casey's trial testimony against Holt was part of his plea agreement.

Lisa eventually pled guilty to felony murder. Although she had not been sentenced at the time of Holt's trial, she expected to receive a life sentence with the possibility of parole in 20 years. Lisa's trial testimony against Holt was also part of her plea agreement.

Sheriff Howser testified that during Holt's stint in the county jail pending trial, Holt contacted the jail supervisor and asked to speak with Howser. Holt was upset and told Howser, "I shot him. I'm the one that shot him." Howser grabbed a voice recorder and asked Holt to repeat himself. Once the recorder was activated, Holt said, "I pulled the trigger." Howser then clarified, "So, you say you pulled the trigger and you're the one that threw the gun down on the ground?" Holt replied, "Yup."

Based in part upon Howser's testimony and the DNA profile on the revolver grip as being consistent with Holt's, the State's theory at trial was that Holt was the shooter. In response, Holt claimed that Casey was the shooter. In support of this theory, Holt presented evidence that Casey had confessed to being the shooter. Specifically, Sheriff Howser testified that Joe Lamb, a jail supervisor, heard Casey tell another inmate that Casey was the one who had shot Kenton. During Casey's testimony, he denied having told the inmate that he was the one who pulled the trigger. KBI agent Ezell Monts testified that Holt did admit to being at the residence but not to doing the shooting.

During deliberations, the jury sent a number of notes to the court, including requests to see evidence and to see copies of testimony. The jury also sent a note informing the court: "At this time we are a hung jury on the murder charge only. Can you give us some guidance?" After the judge asked for clarification of the jury's request, the jury sent a note saying: "We are hung on all offenses

in Count I. Have a verdict for Count II [conspiracy]." The judge ordered them to leave the first count unsigned.

The jury then asked: "If the jury convicts on Count I, first degree murder, does that mean Dustin Holt had to be the one that pulled the trigger?" As the judge contemplated sending the jury home for the night, he received another note that said: "Please clarify the term 'intentionally killed.' " The judge directed the jury to look at the jury instructions for clarification.

Soon after, the jury returned a verdict of guilty on both counts. The trial court denied the State's request to impose a Hard 50 sentence. It determined that Holt was in criminal history category H and sentenced him to 131 months for the conspiracy charge and life imprisonment for the murder. The sentences were to run consecutively.

## ANALYSIS

Issue 1: *The trial court did not err in its jury polling.*

Holt argues that his right to an impartial and unanimous jury was violated when, during polling, the court clerk asked each juror, "Is this the verdict of the jury?" instead of "Is this your [*i.e.*, individual] verdict?" The State primarily responds that Holt's argument is untimely because he failed to object to these procedures until his counsel's appellate brief.

The record reveals that after the jury returned from its deliberations, the clerk read aloud the verdict finding Holt guilty of first-degree murder and conspiracy. The judge then asked the presiding juror, "This is the verdict of the jury?" and "It was a unanimous verdict?" The presiding juror said yes.

Holt's counsel then requested that the jury be polled, so the clerk asked each juror, individually by name: "Is this the verdict of the jury?" Each juror replied, "Yes, it is." Neither Holt nor his counsel raised any objections to the question, to the procedure, or otherwise. The jury was then dismissed.

We begin by acknowledging that the Sixth Amendment to the United States Constitution gives the accused a right to an "impartial jury." The right to a unanimous jury verdict, however, is not constitutional but statutory. *State v. Voyles*, 284 Kan. 239, 250-51,

160 P.3d 794 (2007); see K.S.A. 22-3421; K.S.A. 22-3423(1)(d). Similarly, the right to have a jury poll conducted is not constitutional but statutory. See *Cabberiza v. Moore*, 217 F.3d 1329, 1336 (11th Cir. 2000) ("[W]e know of no constitutional right to have a poll conducted."); see K.S.A. 22-3421.

Jury polling has been a right in Kansas for over 100 years. As we stated in *State v. Muir*, 32 Kan. 481, 481, 4 Pac. 812 (1884):

"A party has, in all cases, the right to know whether the supposed verdict is the verdict of each juror or only one of the jury, and examining the jury by the poll is the only recognized means of ascertaining whether they were unanimous in their decision."

More recently, we discussed the purpose of jury polling in *State v. Panker*, 216 Kan. 347, 349, 532 P.2d 1073 (1975). There we stated:

"Any party in a civil or criminal case has an absolute right to have the jury polled. (*State v. Muir*, 32 Kan. 481, 4 Pac. 812 [1884].) This practice requires each juror to answer for himself, thus creating individual responsibility and eliminating any uncertainty as to the verdict announced by the foreman. It also affords an opportunity for free expression unhampered by the fears or errors which may have attended the private proceedings."

The right of polling the jury, along with the general procedures for releasing the jury verdict, is contained in K.S.A. 22-3421. It states:

"The verdict shall be written, signed by the presiding juror and read by the clerk to the jury, and the inquiry made whether it is *the jury's verdict*. If any juror disagrees, the jury must be sent out again; but if no disagreement is expressed, *and neither party requires the jury to be polled,* the verdict is complete and the jury discharged from the case. If the verdict is defective in form only, it may be corrected by the court, with the assent of the jury, before it is discharged." (Emphasis added.) K.S.A. 22-3421.

The statute is silent on how the jury is to be polled, *i.e.*, how the purposes of polling are to be accomplished. While we acknowledge that the trial court could have been more precise in its clerk's polling language, we also acknowledge that Holt did not object to the polling at the trial court level—at either the time it was conducted or afterward.

There are no Kansas cases on point, but the State argues that this situation is most analogous to the trial court's handling of jury questions during deliberations, citing *State v. Groschang*, 272 Kan. 652, 36 P.3d 231 (2001). There, the jury requested to see a Physician's Desk Reference (PDR) that was not admitted into evidence. The trial judge submitted two sections that had been testified to by the defense expert witness and read during the trial. Defense counsel agreed that the sections should be sent to the jury. On appeal, Groschang complained that a relevant portion of the PDR that had been read to the jury during his expert witness' testimony was not included in the material sent to the jury. 272 Kan. at 672.

This court held that Groschang waived his right to raise the issue on appeal, stating as follows:

"The record clearly shows that Groschang participated in the proceedings and was given the opportunity on the record to voice any objections or to suggest a different response. He did not do so. The time-honored rule that an issue not presented to the trial court may not be raised for the first time on appeal, *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 (1992), also applies to jury requests under K.S.A. 22-3420(3). As the State points out, a timely objection is necessary to give the trial court the opportunity to correct any alleged trial errors. See *State v. Wolfe*, 194 Kan. 697, 699, 401 P.2d 917 (1965).

"Clearly, the defendant had the opportunity to object and to inform the trial court of his dissatisfaction with the court's response to the jury request while the court still had a chance to correct any error. *By failing to object, the defendant waived his right to raise the issue on appeal.*" 272 Kan. at 672-73.

The statute at issue in *Groschang*, K.S.A. 22-3420(3), like its statutory cousin at issue in the instant case, K.S.A. 22-3421, contained no "contemporaneous objection" requirement. Contra K.S.A. 60-404. That requirement is imposed via our general case law. *State v. Kirtdoll*, 281 Kan. 1138, Syl. ¶ 7, 136 P.3d 417 (2006) ("As a general rule, a party cannot raise an issue on appeal where no contemporaneous objection was made and where the trial court did not have an opportunity to rule.").

The case of *State v. Woods*, 218 Kan. 163, 542 P.2d 319 (1975), is also of guidance. Although it did not deal with a possible waiver of the polling procedures issue by failure to object at the trial level, it did recognize the difficulty a defendant presents to an appellate

court when his or her concerns about the verdict are not raised at the time of polling:

"We think it extremely important in this case that following the polling of the jurors, counsel for the defendant did not request the trial court to inquire further into the matter, nor ask the trial court to direct the jury to resume its deliberations. Counsel for the defendant apparently was not concerned about the answers of the jurors and obviously assumed that it would not be to the defendant's advantage to inquire further into the matter. *In the situation presented here the trial court was clearly in a better position to view the jurors' responses to its questions on polling and their demeanor than is this court on the cold record now before us.*" (Emphasis added.) 218 Kan. at 168.

In part because of the defendant's failure to raise concerns about the jurors' responses at the time of polling, this court held that he had failed to show the trial court abused its discretion in not interrogating the jurors further about their verdict, or in its failure to direct they resume deliberations. *Cf. Jackson v. U.S.*, 386 F.2d 641, 643 (D.C. Cir. 1967) (defense counsel waited until the jury was dismissed and dispersed before objecting to the verdict on the ground that a particular juror's answers to the poll showed the verdict was not unanimous; the court stated, "[I]f these circumstances were so plainly evident, it seems to us that they would, as they should, have been immediately called to the court's attention upon the record. Had that been done, any doubts whatever about the state of the jurors' minds could have been cleared up and appropriate action taken before the jury was dismissed. A principal office of the making of objections by counsel in adversary proceedings is not only to assure justice but also to achieve efficiency and expedition in its administration.").

Here, apparently no one interpreted the clerk's polling questions or the jurors' expressions and responses to suggest there was any problem. Holt particularly had the opportunity to object to the polling question 12 times. Yet he failed to object to anything on any ground, which prevented the trial court from having any chance to cure any alleged defect in the polling before the jury was discharged.

While Holt raised this issue for the first time in his appellate brief, it was not until oral arguments before this court that he asked

for us to consider his issue pursuant to the "ends of justice" exception to our general rule. See *State v. Kirtdoll*, 281 Kan. at 1149 ("consideration of the [newly-raised] theory is necessary to serve the ends of justice").

Application of this exception is not warranted under the facts of this case, however, because Holt has failed to show that the polling procedure, *e.g.*, the clerk's question, actually harmed him. We first note that the jury was given an instruction that its verdict must be unanimous; indeed, it was the last instruction given to the jury, stating, "The person selected [as presiding juror] will . . . speak for the *jury* in court and will sign the verdict *upon which you agree*. . . . Your agreement upon a verdict *must be unanimous*." (Emphasis added.) The jury is presumed to follow the instructions. *State v. Cromwell*, 253 Kan. 495, 510, 856 P.2d 1299 (1993). After the verdict was read, the presiding juror, in response to the court's question, confirmed in the jury's presence, that the verdict was the jury's and that the verdict was unanimous. Each juror then individually stated that this was the jury's verdict. There is simply no evidence suggesting that Holt received anything other than a unanimous verdict from an impartial jury, *i.e.*, no comments before the jury was dismissed and no posttrial affidavits from jurors or defense counsel to support Holt's allegations.

The case of *United States v. Lustig*, 555 F.2d 737 (9th Cir. 1977), provides some additional support. There, somewhat similar to the instant case, after the verdict was announced each juror was asked not whether it was "your verdict" but whether a "true verdict" had been announced. Each answered affirmatively. The defendant then requested that the jury be polled as to each of four counts, and the trial court apparently refused. On appeal, the defendant argued that failure to use this procedure was reversible error. The Ninth Circuit rejected this argument, holding that defendant would have a valid objection if one or more jury members expressed some uncertainty as to the verdict; but there was no uncertainty expressed about the "true verdict." 555 F.2d at 746.

We will briefly comment upon proper jury polling. While trial courts do not have to be "letter perfect" in their polling procedures and language, the better practice is to poll the jury in such a way

as to ensure that each juror is answering for himself or herself, *e.g.,* asking, "Is this your verdict?" The American Bar Association suggests:

"The poll should be conducted by the court or clerk of court *asking each juror individually whether the verdict announced is his or her verdict.* If the poll discloses that there is not that level of concurrence required by applicable law, the jury may be directed to retire for further deliberations or may be discharged." (Emphasis added.) ABA Principles for Juries and Jury Trials, American Jury Project, Principle 15(F.) (2005).

At least one federal circuit has also endorsed this view, suggesting that the ABA standards provide the "best practice" for polling. *United States v. Shepherd,* 576 F.2d 719, 723 n.1 (7th Cir. 1978).

Because Holt did not timely object to the polling, he did not preserve this issue for appeal.

Issue 2: *The trial court properly refused Holt's request to add the "mere presence or association" language to the instruction on aiding and abetting.*

Next, Holt argues that the trial court erred when it refused to add the "mere presence or association" language to the aiding and abetting instruction. The State counters that the trial court followed the specific language of PIK Crim. 3d 54.05 and that "[e]rror cannot be predicated on a district court's refusal to give a specific instruction where the instructions given cover and include the substance of the instructions refused." *State v. Pink,* 270 Kan. 728, 738, 20 P.3d 31 (2001).

The PIK instruction on aiding and abetting states:

"A person who, either before or during its commission, intentionally (aids) (abets) (advises) (hires) (counsels) (procures) another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

Holt requested that the following language be added: "Mere association with the principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider or abettor." In denying the request, the trial court

held that this was a matter for closing argument and it was adequately covered by the other instructions.

Holt acknowledges that per the official Comment to PIK Crim 3d 54.05, the trial court may properly refuse to add the "mere presence or association" language because the pattern instruction "clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting." *State v. Pink*, 270 Kan. at 738-39; *State v. Jackson*, 270 Kan. 755, 760-61, 19 P.3d 121 (2001); *State v. Ninci*, 262 Kan. 21, 46, 936 P.2d 1364 (1997); *State v. Scott*, 250 Kan. 350, 361, 827 P.2d 733 (1992); *State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987). However, he argues that the trial court should have given his requested additional language because the jury's questions show, among other things, that it had doubts whether Holt was the shooter.

Holt has not made any novel arguments that convince this court to depart from well-established Kansas law and hold that the trial court erred in rejecting his proposed language. The pattern instruction clearly informs the jury that intentional acts by a defendant are necessary to convict on aiding and abetting. Moreover, as in *Pink*, 270 Kan. at 739, the instruction did not prevent him from arguing that while some evidence suggested he may have accompanied Lisa and Casey to the murder scene, his mere association and presence was insufficient to establish the required intentional acts to convict on aiding and abetting. As in *Pink*, "it was forcibly and logically argued" by Holt's counsel in closing. See 270 Kan. at 739.

Issue 3: *The trial court did not err in overruling Holt's objection to the giving of an aiding and abetting instruction.*

Holt next argues that because there was insufficient evidence to support an aiding and abetting instruction, the trial court erred when it overruled his objection to giving it. He suggests that the court cannot instruct that he was *either* the principal or the aider and abettor, because the State's entire case was built on its assertion that he was the principal, *i.e.*, the shooter. The State responds that there is sufficient evidence to warrant the instruction.

We have held that the aiding or abetting instruction is appropriate if, from the totality of the evidence, the jury could reasonably conclude that the defendant aided and abetted another in the commission of the crime. *State v. Edgar*, 281 Kan. 47, 55, 127 P.3d 1016 (2006).

The case of *State v. Clemons*, 251 Kan. 473, 836 P.2d 1147 (1992), is on point. There, the first-degree murder defendant argued that an aiding and abetting instruction should not have been given. He asserted that he was not charged with aiding and abetting and such evidence was not produced by the State. Indeed, in closing argument the State expressly tried to refute the possibility that anyone besides the defendant was the assailant by stating that the victim's wife, who was at the murder scene, did not actually shoot her husband. 251 Kan. at 485. This court reviewed the evidence and rejected his argument, stating: "Although the State's theory of the case was that Clemons was the person who killed [the victim], from the totality of the evidence the jury could have reasonably concluded that Clemons aided and abetted [victim's wife] in the commission of the crime." (Emphasis added.) 251 Kan. at 486.

In examining the evidence in the instant case, we acknowledge Holt points to the State's evidence that he was the shooter, suggesting that based on that evidence, the jury could not conclude that Casey was the shooter and Holt therefore the aider and abettor. As the State adroitly notes, however, while its prosecution theory was that Holt was the shooter, Holt's entire defense was that Casey was the shooter. Indeed, it was the defense who elicited that part of Sheriff Howser's testimony indicating that Casey confessed to another inmate about being the shooter. Additional evidence from which the jury could conclude that Holt aided and abetted Casey as the shooter was Lisa's testimony that Holt told her to get Kenton close to the blanket in the garage, and Lisa's and Casey's testimony that Holt enlisted Casey to help with the crime.

As in *Clemons*, here the aiding and abetting instruction was proper because the jury reasonably could have concluded from the totality of the evidence that Holt was an aider or abettor to Casey, even though the State's theory was that Holt was the principal. See *State v. Holt*, 260 Kan. 33, 917 P.2d 1332 (1996) (though defendant

charged as a principal in aggravated burglary, under the facts the jury could find him guilty as an aider and abettor; giving of aiding and abetting instruction not error); See also *State v. Gleason*, 277 Kan. 624, 88 P.3d 218 (2004) (sufficient evidence for a jury to find defendant guilty as either a principal or as aider and abettor; giving of aiding and abetting instruction was not error.)

Issue 4: *The district court did not err in instructing the jury that Holt could be convicted as an aider and abettor, even though the State's theory was that he was the shooter: The State did not improperly use inconsistent theories.*

In an argument related to the one Holt made in issue 3, he claims that the trial court erred in giving the aiding and abetting instruction because the State had already determined that Casey was the accessory by accepting his plea to accessory-type crimes. More specifically, Holt contends that the State is prevented from arguing that he was an aider and abettor because it had already concluded that Casey was. As a result, he claims that his due process rights were violated and he was denied a fair trial through the State's inconsistent arguments. The State essentially responds that it is not estopped from taking these positions.

Whether the trial court violated an individual's due process rights is a question of law, to which this court exercises unlimited review. See *State v. Sanders*, 272 Kan. 445, 461, 33 P.3d 596 (2001).

The case of *In re J.W.S.*, 250 Kan. 65, 825 P.2d 125 (1992), is on point. There, the juvenile respondent and his friend went into the country with the respondent's stepfather. The stepfather was killed by 3 shotgun blasts, and both boys were charged with first-degree murder. The friend, Malone, said the respondent shot his stepfather, and Malone then pled guilty to aiding and abetting first-degree murder.

At respondent's trial for first-degree murder, Malone testified that the respondent had shot the victim with premeditation. In respondent's testimony, he claimed for the first time that Malone shot the victim. Based upon these new facts, the State amended the information to include aiding and abetting as an alternative

charge against respondent. The jury convicted the respondent of aiding and abetting in the murder.

We rejected respondent's first argument that there was no evidence to support his conviction of aiding and abetting. We held that "Under the evidence the jury could, and apparently did, find that the boys planned the murder, that Malone did the actual shooting, and that respondent was an active participant in the murder." 250 Kan. at 67-68.

In what this court described as an "offshoot" to the first issue, the respondent then made an argument quite similar to the one made by Holt:

"As an offshoot to this issue, *respondent contends that the State, having accepted Malone as an aider and abettor in the crime, cannot charge respondent as an aider and abettor.* Respondent concedes that an aiding and abetting conviction is valid even if the alleged principal is acquitted or convicted of a lesser charge. . .

"*Under respondent's theory, once the prosecution permits one of two codefendants to plead guilty to aiding and abetting, then it is locked into proving the second defendant is the principal. If it fails to prove the same, then the second defendant must be acquitted.* . . . We find no merit in the estoppel argument." (Emphasis added.) 250 Kan. at 68.

As we summarized in the opinion syllabus: "Where two defendants are charged with the commission of a crime and one enters a plea of guilty thereto as an aider and abettor, the State is not estopped by virtue of the earlier plea from alternatively charging the other as an aider and abettor." 250 Kan. 65, Syl. ¶ 3.

Although the *In re J.W.S.* court did not deal with the jury instruction issue, as argued here, rejection of Holt's argument naturally flows from that court's holding. If the State is not estopped from charging aiding and abetting, then it is not estopped from requesting a jury instruction on that charge. In *Smith v. State*, 765 N.E.2d 578 (Ind. 2002), the Indiana Supreme Court dealt with the jury instruction issue in this specific context. There, one Lampley pled guilty to an accomplice-based crime and became the principal witness against Smith in his retrial on murder charges. The State proceeded on the theory that Smith killed the victim. It also asked for and received an accomplice jury instruction, however, believing the jury might instead find that Lampley had killed the victim and

that Smith had aided Lampley. After Smith's conviction of murder and other crimes, he argued on appeal that because the State had given Lampley a plea bargain for an accomplice-based crime, the doctrine of judicial estoppel precluded an instruction based upon a State theory inconsistent with Smith committing the murder, *i.e.*, his aiding Lampley in committing the killing. The Indiana Supreme Court rejected the argument.

In addition to our reliance upon these authorities to reject Holt's claim, we observe that accepting it would cause considerable problems. As mentioned, while the State's theory was that Holt was the shooter, Holt's defense was that Casey was the shooter. Once some evidence was provided to support Holt's defense, *e.g.*, Sheriff Howser's testimony that Casey told an inmate he was the shooter, the State felt obligated to proceed under an alternate prosecution theory: Holt was perhaps simply the aider and abettor. With Holt's objection to the State's request for an aiding and abetting instruction in support of this alternate theory, however, he essentially seeks to prevent the jury from considering that he was simply an aider and abettor—despite the existence of evidence to that effect and despite the fact he denied being the shooter. Instead, Holt improperly seeks to force the jury to have only two choices: that he was either the shooter or that he was not involved at all.

Issue 5: *The trial court erred in ordering Holt to reimburse BIDS for attorney fees.*

Next, Holt argues that the trial court erred when it ordered him to reimburse BIDS for attorney fees because the court failed to consider his ability to pay, the financial burden that payment would impose, and the validity of the fees. The State concedes that the matter should be returned to the lower court with instructions to comply with K.S.A. 2006 Supp. 22-4513.

Under K.S.A. 2006 Supp. 22-4513, a trial judge may require a defendant to reimburse the State for attorney fees. As we noted in *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006), however, that judge must consider on the record at the time of assessment the financial resources of the defendant and the nature of the burden that payment of the fees will impose. 281 Kan. 538, Syl. ¶ 1.

We also held that the sentencing court's failure to explicitly consider the financial resources of the defendant and the nature of the burden that payment of the fees would impose was reversible error. 281 Kan. at 546-48; see *State v. Voyles*, 284 Kan. 239, Syl. ¶ 8, 160 P.3d 794 (2007).

Here, the trial court failed to make particularized findings on the record. The State told the trial court that based on the BIDS cost reimbursement table for off-grid trials lasting less than 2 weeks, the fee would be $7,000. While there was some discussion about Holt's ability to pay restitution, the trial court did not consider his ability to pay attorney fees. The court simply ordered him to pay the BIDS reimbursement fee of $7,000.

The matter is remanded to the district court with orders to comply with K.S.A. 2006 Supp. 22-4513 in determining Holt's ability to pay BIDS fees.

Issue 6: *The trial court did not err in using Holt's prior convictions to calculate his criminal history score.*

For his last claim of error, Holt argues that the trial court erred by including his prior convictions in calculating his criminal history score. The State responds that his argument is contrary to well-established precedent.

The constitutionality of the Kansas Sentencing Guidelines Act is a question of law over which appellate courts exercise unlimited review. *State v. Ivory*, 273 Kan. 44, 46, 41 P.3d 781 (2002). There, we held that the use of criminal history scores is not unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000).

Holt claims that *Ivory* should be overturned in light of the United States Supreme Court's decisions in *Shepard v. United States*, 544 U.S. 13, 161 L. Ed. 2d 205, 125 S. Ct. 1254 (2005); *Blakely v. Washington*, 542 U.S. 296, 159 L. Ed. 2d 403, 124 S. Ct. 2531 (2004); and *Johnson v. United States*, 544 U.S. 295, 161 L. Ed. 2d 542, 125 S. Ct. 1571 (2005). We have recently considered this precise argument and have refused to overrule our prior decisions. See *State v. Gaither*, 283 Kan. 671, 693, 156 P.3d 602 (2007); *State v. Gonzalez*, 282 Kan. 73, 117-18, 145 P.3d 18 (2006)

(affirming *Ivory* rule after United States Supreme Court post-*Apprendi* decisions in *United States v. Booker*, 543 U.S. 220, 160 L. Ed. 2d 621, 125 S. Ct. 738 (2005), *Blakely*, and *Shepherd*). Holt has not presented any new facts or law that merit reconsideration of this issue.

Consequently, the trial court did not err when it included Holt's prior convictions in its calculation of his criminal history score.

Convictions and sentences affirmed. Remanded to the district court for redetermination of the BIDS fee reimbursement.

DAVIS, J., not participating.

GREENE, J., assigned.