NOT DESIGNATED FOR PUBLICATION

No. 127,178

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL BETANCOURT,
*Appellant*.

MEMORANDUM OPINION

Appeal from Ellis District Court; GLENN R. BRAUN, judge. Submitted without oral argument. Opinion filed January 30, 2026. Affirmed.

*Sean P. Randall*, of Kansas Appellate Defender Office, for appellant.

*Tyler W. Winslow*, assistant solicitor general, and *Kris W. Kobach*, attorney general, for appellee.

Before WARNER, C.J., ARNOLD-BURGER and PICKERING, JJ.

PER CURIAM: After a jury trial, Daniel Betancourt was convicted of several offenses arising from sexual interactions with two young girls. He appeals, arguing that a series of rulings by the district court and arguments by the State require that he be retried. After carefully reviewing the record before us and the parties' arguments, we conclude that Betancourt has not demonstrated any error that requires reversal. We therefore affirm his convictions.

1

## FACTUAL AND PROCEDURAL BACKGROUND

The facts giving rise to Betancourt's convictions are well known to the parties, and we need not repeat them in detail here. Highly summarized, in 2007 Betancourt lived with a woman we call "Mother," their two infant daughters, and Mother's two children from a previous relationship, who we refer to as "Jane" (age 7) and "Jackie" (age 8). One evening, Jane and Jackie told Mother that Betancourt had been coming into their room at night and touching them and himself. Mother removed the children from the home, and the State conducted an investigation into the girls' claims. Shortly after Betancourt was confronted with these allegations, he fled to Mexico, where he remained for over 14 years.

The State charged Betancourt with three counts of rape, five counts of aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child and issued a warrant for his arrest. In August 2021, Betancourt was arrested in Texas when attempting to cross the U.S.-Mexico border.

Betancourt's case proceeded to trial. Jane, Jackie, and Mother all testified about what had occurred in 2007. Betancourt also took the stand and denied that he had any sexual interactions with the girls, leaving the jury with a credibility question as to which version of the events had taken place. The jury ultimately found Betancourt guilty of all the crimes charged. The district court imposed a controlling sentence of two consecutive terms of life imprisonment without the possibility of parole for 25 years, plus lifetime post-release supervision.

Betancourt appeals, arguing that errors during his trial undermined the fairness of that proceeding and necessitate a new trial. We will provide additional details relevant to those claims as they arise in this opinion.

DISCUSSION

Betancourt asserts that three errors from his trial, either individually or in combination, require a new trial on the charges against him. He argues that the district court erroneously allowed the prosecutor to influence the jury's credibility assessment by asking Betancourt during cross-examination if he believed Jane and Jackie were "lying." He also asserts that the district court should have granted his request for a mistrial after the court referenced his current incarceration in front of the jury. And he claims that the prosecutor erred during closing arguments by opining that certain evidence showed that Betancourt had fantasized about having sex with the girls.

1. *The district court erred when it allowed the State to question Betancourt about the credibility of the victims, but this error did not affect the outcome of the trial.*

Betancourt first argues that the district court erred when it allowed the prosecutor to ask Betancourt questions during cross-examination regarding Jackie's and Jane's credibility. He asserts that these questions invaded the realm of the jurors, who are called on to assess witness credibility. And he argues that because this case largely came down to which version of the events—the girls' or his own—was more believable, the prosecutor's questions cannot be considered harmless.

This argument requires some additional background. As we have noted, Betancourt testified during direct examination that he did not commit any of the sexual acts the girls alleged and did not know why those allegations had been made. During cross-examination, the prosecutor asked Betancourt, "What exactly are you asserting then other than 'I didn't do this?' Are you claiming then that [Jane] is lying?" Betancourt objected, claiming the question was speculative and invaded the province of the jury, but the district court overruled the objection. Betancourt then answered, "I don't know. I don't know why they would say this. I didn't do that to them." The prosecutor then asked several related questions along these same lines without objection.

3

The State asserts that because Betancourt only objected to one question by the prosecutor, the prosecutor's initial question is the only matter preserved for our review. See K.S.A. 60-404 (judgment shall not be set aside based on erroneous admission of evidence without a timely and specific objection). But our review shows that the prosecutor's questions occurred in close proximity and time, right after the court had overruled Betancourt's first objection. The parties and court were all aware of Betancourt's objection. Under these limited circumstances, we conclude that the prosecutor's entire line of questioning—and Betancourt's responses—are preserved for our review.

Two decades ago in *State v. Elnicki*, 279 Kan. 47, 53-54, 105 P.3d 1222 (2005), the Kansas Supreme Court cautioned that a district court "has no discretion on whether to allow a witness to express an opinion on the credibility of another witness; such evidence must be disallowed as a matter of law." This rule is rooted in the recognition that "the determination of the truthfulness" of a person's testimony is a question reserved for the jury. 279 Kan. at 53.

In *Elnicki*, the prosecutor played a video of a detective's interrogation of the defendant where the detective repeatedly called the defendant a liar (or stated that he was lying). The Supreme Court found the admission of this evidence to be error. 279 Kan. at 57. And it found that this error combined with others—in particular, the prosecutor's repeated statements during closing argument that the defendant was lying—required the reversal of the defendant's conviction and the grant of a new trial. 279 Kan. at 67-68.

Since *Elnicki* was decided, several unpublished decisions of this court have questioned whether the bright-line rule announced there was as stark as it appeared. See *State v. Ogwangi*, No. 124,328, 2024 WL 1953963, at *5-6 (Kan. App.) (unpublished opinion) (discussing cases), *rev. denied* 319 Kan. 835 (2024). And we note that there is a

4

difference between watching someone with apparent authority like a police detective repeatedly call the defendant a liar, as in *Elnicki*, and what happened in this case—asking Betancourt himself for an explanation during cross-examination as to why the girls' explanation of what had occurred was so different from his complete denial. We are also mindful that the evidence objected to here was *Betancourt* discussing the complaining witnesses' credibility, not another witness commenting on *the defendant's* credibility. But our court is duty-bound to follow Kansas Supreme Court precedent, and *Elnicki* remains our governing caselaw. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). Here, Betancourt was repeatedly asked about whether the other witnesses at trial were telling the truth. We presume under *Elnicki* that the district court erred when it permitted this testimony.

Our review of the record, however, shows that this exchange did not affect the outcome of the trial. See K.S.A. 2024 Supp. 60-261; *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 (2011). Betancourt argues that because his case hinged on the credibility of the witnesses' testimony, the prosecutor's questioning cannot be considered harmless. He notes that the Supreme Court in *Elnicki* described the prosecutor's allegations during closing argument that the defendant was lying as tipping the scales in "one of the main issues in the case." *Elnicki*, 279 Kan. at 65. But we disagree that any comment on the credibility of the witnesses automatically requires reversal; indeed, such a holding would render the reversibility discussion in *Elnicki* superfluous. Instead, we must review the record and determine whether our faith in the outcome of the trial is shaken in light of the exchange between Betancourt and the prosecutor during cross-examination. It is not.

By the time Betancourt was testifying as part of his defense, the jury had already heard detailed testimony from Jane, Jackie, and Mother, as well as from others involved in the investigation of Jane's and Jackie's allegations, about their claims. Betancourt's testimony was starkly different from those explanations; he denied that any sexual encounters had occurred. It was impossible for both versions of these events to be true.

Thus, it was clear that one of the two sides was not providing an accurate description of what had taken place.

Thus, the prosecutor's questions of Betancourt, while eliciting evidence that otherwise would be inadmissible, did not add any evidence or position the jury was not already aware of. Accord *State v. Manning*, 270 Kan. 674, 701-02, 19 P.3d 84 (2001) ("The improper questions asked by the prosecutor were tempered, however, by Manning's responses" and "the evidence against him."), *overruled in part on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009). Nor did the prosecutor here dwell on Betancourt's testimony regarding the girls' credibility during closing argument, as the prosecutor did in *Elnicki*.

In short, the district court erred when it allowed the prosecutor to ask Betancourt if he believed Jane, Jackie, and Mother were lying. But after reviewing the entire trial transcript, we are convinced that the exchange here between the prosecutor and Betancourt did not affect the outcome of his trial.

2. *The district court did not abuse its discretion by denying Betancourt's motion for a mistrial.*

Betancourt next argues that the district court should have granted his motion for a mistrial on the morning of the third day of trial to address comments the court made before the jury on the previous afternoon. Betancourt argues that the jury could infer from these comments that Betancourt was being held in jail while the trial was ongoing, and this information would color the jury's evaluation of the evidence.

Again, this argument requires additional background. On the second day of Betancourt's trial, the district court took a short break between witnesses. During the break, the court briefly discussed with the parties the schedule of proceedings the next

6

morning, including when the parties were expected to be in the courtroom. The court told the parties that they were to review the jury instructions and to be ready to discuss them with the court before the trial continued. The court also told defense counsel to "[l]et the jail know [Betancourt] needs to be in the chair by 8:00; not getting dressed at 8:00, but here by 8:00 a.m." The jury had not been dismissed and heard this exchange.

The next day, outside the presence of the jury, the district court informed the parties that the court recognized that it had erred when it referenced Betancourt's pretrial custody in front of the jury and discussed the appropriate steps it should take to mitigate this misstep. Betancourt moved for a mistrial or, in the alternative, requested a jury instruction and jury poll. The district court denied the request for a mistrial but took the other steps Betancourt requested.

During these discussions, the district court and defense counsel noted that the jurors may have inferred Betancourt's incarceration—even absent the judge's comment—for several reasons. For example, a police officer had testified that Betancourt was in Mexico for 14 years before he was arrested at the border. The court stated that "we shouldn't assume that [jurors] are ignorant. Somebody gets arrested who has been gone for 14 years, they could logically assume they had remained in custody pending the trial."

The district court noted that a mistrial was "the most extreme remedy" and opined that option was not appropriate. But the court asked Betancourt to consult with his counsel and consider three other options: a curative instruction, polling the jury to see "whether they have formed an opinion as to whether the defendant is in custody or not" and "whether that opinion is going to influence their decision," or do nothing so as not to draw further attention to his detention. Betancourt ultimately requested both an instruction and a jury poll.

7

The district court then recalled the jury. It instructed the jurors that they were to "draw no inference from anything I might have said or you have observed with regard to where the defendant may be residing during the trial." Then the court polled the jury, asking each individually if any comments made caused them to form an opinion of whether Betancourt was in custody. All jurors responded in the negative. The court then asked a "general question" if anyone in the jury was unable to evaluate the evidence and render a fair and impartial verdict; no juror came forward. Finally, the court asked the jurors to say, by show of hands, if they could be fair and impartial to both parties. All jurors raised their hands. Then, the judge asked defense counsel if they wanted to add anything to the polling; counsel responded, "No, Your Honor. We are satisfied."

On appeal, Betancourt argues that the district court's admonishment did not mitigate the harm caused by the error because the "admonition did nothing more than highlight [Betancourt's] incarcerated status, and . . . a bell cannot be unrung." And Betancourt argues that the admonition was not effective because it was orally delivered in the midst of trial rather than re-read as part of the instructions read before closing arguments. Nor was it provided in written form to the jury.

K.S.A. 22-3423(1)(c) states that a district court may grant a mistrial in a criminal case if "prejudicial conduct . . . makes it impossible to proceed with the trial without injustice" to the parties. Similarly, K.S.A. 22-3501(1) recognizes that a district court may grant a new trial if such a remedy is "required in the interest of justice." While the statutory language giving rise to these remedies differs, both motions seek to answer the same fundamental question—"whether the challenged event deprived [the defendant] of a fair trial." *State v. Harris*, 313 Kan. 579, 585, 486 P.3d 576 (2021).

In both instances, appellate courts review the district court's finding that a defendant has received a fair trial for an abuse of discretion. See 313 Kan. at 585. A court abuses its discretion when it renders a decision based on a legal or factual error or if that

8

decision is one with which no reasonable judicial officer would agree. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023). This deferential standard reflects the district court's position in observing witness testimony, evaluating the parties' arguments in real time, and managing the proceedings—tasks an appellate court can only review from a cold record. See *State v. Schaefer*, 305 Kan. 581, 595, 385 P.3d 918 (2016).

Our analysis as to whether the district court's rulings deprived Betancourt of a fair trial involves two steps. *State v. Carr*, 314 Kan. 744, 772-73, 502 P.3d 511 (2022), *cert. denied* 143 S. Ct. 584 (2023). We first determine whether the district court erred—that is, whether there was some "fundamental failure" in the proceedings at trial. 314 Kan. at 773. If an error occurred, we assess whether there is a reasonable probability it affected the outcome of the trial in light of the entire record. 314 Kan. at 773. A reasonable probability is one that is sufficient to undermine our confidence in the jury's verdict. See *State v. Rodriguez*, 302 Kan. 85, 93, 350 P.3d 1083 (2015).

The district court here recognized that its reference to the jail in front of the jury was an error. Kansas courts have recognized the principle that requiring detainees to be dressed in jail uniforms and commenting upon their pretrial detainee status creates an inference in the minds of the jurors as to the "seriousness of the crime charged or an extended criminal history." *State v. Simmons*, 45 Kan. App. 2d 491, 496, 249 P.3d 15 (2011), *aff'd* 295 Kan. 171, 283 P.3d 212 (2012). Thus, courts should "take reasonable steps to avoid fostering those extraneous and impermissible impressions." 45 Kan. App. 2d at 496.

But not every trial error necessitates a mistrial. As the court and parties discussed, the court's brief comment about the jail was not the only source from which the jury could infer that Betancourt was being detained in jail. Thus, we agree that setting aside the trial and starting anew was not necessary, especially given the 14-year delay caused by Betancourt's earlier absence. Although Betancourt now challenges the manner in

which the court proceeded with the curative instruction and jury poll, these were the actions Betancourt requested as remedies. And including yet another curative instruction at the close of trial—which Betancourt did not request but now says should have been given—would only have drawn further attention to Betancourt's detention.

Betancourt also argues that the polling done by the district court was insufficient because the jurors were not individually polled as to whether each juror could render a fair and impartial verdict. The district court asked each juror the first question—whether they had formed an opinion on the defendant's custody status—but then asked the group whether that opinion made them unable to be fair and impartial.

The right to request a jury poll is contained in K.S.A. 22-3421. The purpose of polling the jury is—as the defendant cites—to require "each juror to answer," thus "creating individual responsibility and eliminating any uncertainty." *State v. Panker*, 216 Kan. 347, 349, 532 P.2d 1073 (1975). But the statute concerning jury polling is silent as to "how the purposes of polling are to be accomplished." *State v. Holt*, 285 Kan. 760, 767, 175 P.3d 239 (2008). If someone believes polling is conducted incorrectly or is insufficient in its scope, the party must bring that deficiency to the district court's attention through a contemporaneous objection. 285 Kan. at 770-71.

Betancourt did not object to the jury polling at trial. Instead, when the court asked whether further polling was necessary, his attorney responded that Betancourt was "satisfied." He may not now claim error on appeal.

We recognize, as the district court did here, that the reference to the jail in front of the jury was regrettable. But our review of the record shows that the manner in which the district court handled the situation—discussing the situation with the parties outside the presence of the jury, denying the mistrial, and offering several other options for ways to

10

proceed—was eminently reasonable. Betancourt has not apprised us of any error in denying the mistrial or otherwise instructing or polling the jury.

3. *The prosecutor drew reasonable inferences during closing argument based on the evidence.*

Betancourt also challenges the prosecutor's statements during closing argument that the jury could infer from certain testimony that Betancourt was "fantasizing" about having sex with Jane and Jackie when he was having sex with Mother. Betancourt argues that these statements were inflammatory, based on speculation, and not supported by the record. We disagree.

Following Mother's testimony earlier in the trial, the State played a forensic interview between Mother and an investigating doctor in 2007. During that interview, Mother told the doctor that at one point shortly before the girls came forward with their allegations, she and Betancourt were having sex. According to Mother, Betancourt whispered to her, "Don't tell your mom." He then told her that he was just "playing."

During closing argument, the prosecutor again showed the video of Mother's interview recounting this episode. The prosecutor argued that Betancourt "was fantasizing" about Jane and Jackie. Betancourt's attorney objected to this characterization of the evidence, but the objection was overruled.

Generally, a prosecutor has wide latitude in making arguments and commenting on the defense's case. *State v. Anderson*, 318 Kan. 425, 438, 543 P.3d 1120 (2024). Claims of prosecutorial error are evaluated by appellate courts according to a two-step process described simply as "error and prejudice." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). To determine whether an error has occurred, the appellate court must determine whether the prosecutor acted "outside the wide latitude afforded

prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial." 305 Kan. at 109.

A prosecutor's challenged comments should be evaluated in the context in which they occurred and not in isolation. Prosecutors may make arguments that are relevant and reasonably inferred from the evidence admitted at trial. *State v. Tahah*, 302 Kan. 783, 788-89, 358 P.3d 819 (2015). Here, the evidence showed that Mother told a forensic interviewer that Betancourt had whispered, "Don't tell your mom" while they were having sex a week before Jane came forward. The evidence also showed that Betancourt had been engaging in sexual acts with Jane and Jackie for some time before Jane told Mother.

Betancourt further argues that the use of the word "fantasize" itself was error, as it made the argument as "sexually charged as possible." But colorful and passionate statements alone are not error. See *State v. Foster*, 290 Kan. 696, 723-24, 233 P.3d 265 (2010).

The prosecutor's argument was a reasonable inference based on the evidence.

4. *Betancourt has only identified one error, so his claim of cumulative error fails.*

In his final argument, Betancourt argues that even if the errors he has alleged do not individually require reversal, the combination of those errors denied him a fair trial. But the only error Betancourt has identified was the district court's permitting questions about whether Betancourt believed the complaining witnesses were lying—an error that did not require reversal. Betancourt's claim of cumulative error is thus unpersuasive. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021).

Affirmed.